UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| ENGAGE, INC., et al.,[1] | ) | Case Nos. 03-43655-JBR through |
| | ) | 03-43657-JBR, 03-43659-JBR |
| Debtors. | ) | 03-43661-JBR and 03-43662-JBR |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| ROPES & GRAY LLP, | ) | |
| | ) | |
| Appellant, | ) | Case No. 04-40225-DPW |
| | ) | |
| v. | ) | |
| | ) | |
| CRAIG R. JALBERT, LIQUIDATING | ) | |
| SUPERVISOR OF ENGAGE, INC., | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

**BRIEF OF APPELLEE**

Richard W. Benka (BBO #037320)
Andrew Z. Schwartz (BBO #544653)
Euripides D. Dalmanieras (BBO #650985)
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA 02210
Tel.: (617) 832-1000
Fax: (617) 832-7000
*bctnotices@foleyhoag.com*

December 21, 2004

---

[1] The Debtors are the following entities: Engage, Inc., MediaBridge Technologies, Inc., AdSmart Corp., Flycast Communications Corp., AdKnowledge, Inc., and Internet Profiles Corp. (together, the "Debtors").

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................iii

STATEMENT OF BASIS OF APPELLATE JURISDICTION ..............................1

STATEMENT OF ISSUES...................................................................................3

STATEMENT OF THE CASE AND STATEMENT OF FACTS .........................4

SUMMARY OF ARGUMENT...............................................................................4

I.    THE BANKRUPTCY COURT PROPERLY FOUND THAT, AS A MATTER OF
      CONFLICT OF LAWS, MASSACHUSETTS LAW DOES NOT APPLY. ...............6

      A.  Both federal and Massachusetts choice-of-law rules adopt the Restatement,
          including its "most significant relationship" test.....................................6

      B.  Ropes & Gray mischaracterizes the relationship of this dispute to
          Massachusetts. .......................................................................................7

      C.  Massachusetts law does not apply.........................................................11

      D.  There is no "charging lien" in this case under either Virginia law or federal
          common law. ..........................................................................................17

II.   EVEN IF MASSACHUSETTS LAW APPLIES, THE MASSACHUSETTS
      ATTORNEY'S LIEN STATUTE DOES NOT CREATE THE LIEN CLAIMED BY
      R&G................................................................................................................18

      A.  The Bankruptcy Court correctly determined that the only proceeds on which
          Section 50 provided a lien were those whose payment was compelled by a
          "judgment, decree or other order." ......................................................18

      B.  Even R&G must acknowledge that this case does not involve proceeds derived
          from a "judgment, decree or other order." ..........................................24

      C.  R&G mischaracterizes Webber v. Napolitano ......................................26

      D.  Decisions interpreting the statutes of other states prove nothing. ........28

      E.  Section 50A, if anything, confirms that Section 50 does not apply to patents and
          patent applications.................................................................................29

      F.  Section 50 distinguishes between funds created by "judgments, decrees or other
          orders" (which includes settlements) and funds arising from the sale of claims. 30

**III.    R&G'S ARGUMENTS UNDER THE BANKRUPTCY CODE IGNORE THE FACT THAT SECTION 50 DOES NOT GRANT LIENS ON THE PROCEEDS OF THE SALES OF PATENTS AND PATENT APPLICATIONS.................................32**

**IV.    NO QUESTIONS SHOULD BE CERTIFIED TO THE SUPREME JUDICIAL COURT.................................................................................................34**

**CONCLUSION .................................................................................................34**

# TABLE OF AUTHORITIES

## Cases

Adams, George, Lee, Schulte, & Ward, P.A. v. Westinghouse Elec. Corp.,
   597 F.2d 570 (5th Cir. 1979) ...................................................................................17

In re Albert, 206 B.R. 636 (Bankr. D. Mass. 1997)....................................................24

In re American Metrocomm Corp., 274 B.R. 641 (Bankr. D. Del. 2002) ......7, 6, 8, 11, 12, 13, 16

Anderson v. Farmers Co-op Elevator Ass'n, Inc., 874 F. Supp. 989(D. Neb. 1995)...................17

Banushi v. Dorfman, 438 Mass. 242 (2002) ...............................................................24

Bushkin Associates, Inc. v. Raytheon Co., 393 Mass. 622, 632-33 (1985)....................................7

Cohen v. Lindsey, 38 Mass. App. Ct. 1, 644 N.E.2d 250 (Mass. App. Ct. 1995).................. 20, 23

Cosme v. Whitin Mach. Works, Inc., 417 Mass. 643 (1994).......................................................7

Craft v. Kane, 51 Mass. App. Ct. 648, 747 N.E.2d 748 (Mass. App. Ct. 2001)........ 20, 21, 22, 23

Craft v. Kane, 434 Mass. 1108, 757 N.E.2d 730 (2001)..............................................................22

In re Engage, 315 B.R. 208 (Bankr. D. Mass. 2004)......................... 1, 2, 8, 17, 18, 19, 24, 25, 32

In re Fitterer Engineering Associates, Inc., 27 B.R. 878(Bankr. E.D. Mich. 1983)............... 15, 16

In re Gaston & Snow, 243 F.3d 599 (2d Cir. 2001) .....................................................................7

Great Lakes Transit Corp. v. Marceau, 154 F.2d 623 (2d Cir. 1946)..........................................13

Hedman, Gibson & Costigan, P.C. v. Tri-Tech Systems Int'l, Inc., 1994 WL 18536 (S.D.N.Y. 1994), modified by 1995 WL 555702 (S.D.N.Y. 1995) ...................................................17, 29

In re Hollingsworth, 198 B.R. 832 (Bankr. M.D. Fla. 1996)................................................23, 25

Hoxsey v. Hoffpauir, 180 F.2d 84, 86 (5th Cir. 1950) ..................................................... 15, 16, 17

King v. Beale, 198 Va. 802, 96 S.E.2d 765 (1957) ....................................................................10

Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941)............................................................7

Kourouvacilis v. AFSCME,
   53 Mass. App. Ct. 1116, 761 N.E.2d 1013 (Mass. App. Ct. 2002) ...................................22, 23

In re Leading Edge Prods., 121 B.R. 128 (Bankr. D. Mass. 1990) ........................... 18, 19, 20, 22

Lehigh & N.E. R. Co. v. Finnerty, 61 F.2d 289 (3rd Cir. 1932) ................................................ 8,15

Losacco v. F.D. Rich Const. Co., 992 F.2d 382 (lst Cir. 1993) ................................................... 34

In re Military Circle Pet Center #94, Inc., 181 B.R. 282 (Bankr. E.D. Va. 1994) ................ 15, 16

Misek-Falkoff v. IBM, 829 F. Supp. 660 (S.D.N.Y. 1993) ........................................................ 17

In re Morse Tool, Inc., 108 B.R. 384 (Bankr. D. Mass. 1989) .................................................. 6, 7

Nile v. Nile, 432 Mass. 390 (2000) ............................................................................................. 7

Peresipka v. Elgin, Joliet & Eastern Ry. Co., 231 F.2d 268 (7th Cir. 1956) .......................... 13, 14

Person v. Lemelson, 1990 WL 144208 (S.D.N.Y. 1990) ...................................................... 15, 16

PGR Mgmt. Co., Inc. v. Credle, 427 Mass. 636, 694 N.E.2d 1273 (1998) ................................ 24

Phalon v. Technical Communications Corp., 1999 WL 1326754 (Mass. Super. 1999)......... 22, 24

Renaud v. General Motors Corp., 316 F. Supp. 2d 77 (D. Mass. 2004)..................................... 17

In re Rothwell, 159 B.R. 374 (Bankr. D. Mass. 1993) ............................................................... 24

Sadowsky v. Bishop, 1998 WL 1182098 (Mass. Super. 1998)................................................... 23

Schroeder, Siegfried, Ryan & Vidas v. Modern Elec. Prods., Inc.,
    295 N.W.2d 514 (Minn. 1980) ..................................................................................... 17, 28

Smith v. Louisville & Nashville RR. Co., 313 Ill. App. 396,
    40 N.E.2d 539 (Ill. App. Ct), rev'd on other grounds, 381 Ill. 55, 44 N.E.2d. 841 (1942)....... 14

Torphy v. Reder, 357 Mass. 153, 257 N.E.2d 435 (1970) ................................................... 18, 24

Underwood v. Phillips Petroleum Co., 155 F.2d 372 (10th Cir. 1946) ........................................ 14

Webber v. Napolitano, 320 Mass. 765 (1947) .................................................................... 26, 27

## Statutes

28 U.S.C. § 158(a)(1)................................................................................................................1

28 U.S.C. § 158(a)(3)................................................................................................................2

35 U.S.C. § 2(b)(2)(D) ...................................................................................................9

M.G.L. c. 221 § 50.............................................................................................. passim

## Other Authorities

<www.ropesgray.com/practices/attorneys.aspx?SectionID=4&AreaID=000109734003&FocusID
=000112840003&IndustryID=>, ...........................................................................9

37 C.F.R. § 11.5............................................................................................................9

37 C.F.R. § 10.64.......................................................................................................10

B. Selya, "Certified Madness: Ask a Silly Question…,"
29 Suffolk U. L. Rev. 677, 691 (1995) ................................................................34

Letter from Corporation Counsel, City of Boston,
to Hon. John Mackey, Chairman, Committee on the Judiciary (February 2, 1945)................30

*Restatement (Second) of Conflict of Laws (1971)* .............................................. 7, 8, 12

## STATEMENT OF BASIS OF APPELLATE JURISDICTION

The October 8, 2004 Order of the Bankruptcy Court ("October 8 Order") from which Ropes & Gray LLP ("R&G") appeals does not constitute a final order within the meaning of 28 U.S.C. § 158(a)(1), and is thus not appealable as of right.[2]  As set forth in more detail in the "Answer of the Liquidating Supervisor to the 'Protective Motion of Ropes & Gray LLP Under 28 U.S.C. § 158(a)(3) and Bankruptcy Rule 8003 For Leave to File Interlocutory Appeal'" (U.S.D.C. Docket No. 2, Exhibit A), the October 8 Order does not "conclusively determine" the R&G claim.  That order merely found that R&G did not have a *secured* claim, but left open other issues which were not merely "ministerial or mechanical tasks" concerning R&G's claim.  The order was thus akin to a grant of partial summary judgment in the Liquidating Supervisor's favor.

Contrary to the representations of R&G, the Liquidating Supervisor did not object to the overall amount of R&G fees solely on the ground "that R&G had not attached any detailed time records to its proof of claim," an objection which R&G suggests is moot as the records have since been provided.  Brief of Appellants ("Appellant's Brief") at 3.  The Liquidating Supervisor made clear below that he reserved all his rights to object to the amount of the fees on other grounds, at the appropriate time.  Transcript of 9/21/04 Hearing at 3.  Even before having the opportunity to review R&G's time and expense records, the Liquidating Supervisor noted that R&G was required to establish that its fees were reasonable (whether or not it has a lien), particularly in light of the consideration paid to the Debtors for patents and patent applications; to establish the amount of consideration actually paid for patents and patent applications (as distinct from other intellectual property sold at the same time); and to establish whether the

---

[2] The October 8 Order and underlying Decision are Bankruptcy Court Docket Nos. 594 and 593, respectively.  The decision is reported at In re Engage, 315 B.R. 208 (Bankr. D. Mass. 2004).

proceeds of a pre-bankruptcy sale can be traced (indeed, R&G asserted no lien at the time of that sale, indicating that it has waived its claim with regard to that sale).[3]  Under the Bankruptcy Court's procedural orders, the Liquidating Supervisor is required to file his objection to R&G's unsecured claim for attorney's fees on or before December 29, 2004, and will do so.

While the October 8 Order is not appealable as of right, this Court does have discretion to grant an interlocutory appeal of some or all of the issues presented by R&G under 28 U.S.C. § 158(a)(3).  For reasons stated in his "Counter-Statement of the Liquidating Supervisor of Issues That May Be Presented on Appeal and Statement That Appeal is Not of Right" (U.S.D.C. Docket No. 2 & Exhibit A), the Liquidating Supervisor initially submitted that while such leave to appeal should be granted with respect to two of the four issues R&G would like to present, the other two were not decided by the Bankruptcy Court.[4]

The fact that R&G is, however, now seeking to further stratify this proceeding via certification of three of its four issues to the Massachusetts Supreme Judicial Court, where additional briefing and argument would be involved, leads the Liquidating Supervisor to conclude that proceeding with an interlocutory appeal may no longer be worth the time or trouble for either side, or for this Court.[5]  This appeal involves only the difference between the

---

[3] Reply of the Liquidating Supervisor to the Response of Ropes & Gray LLP to the Objection to the Secured Claim of Ropes & Gray LLP, at 7 (Bankr. Ct. Docket No. 569).  R&G is, for example, asserting a claim of $64,000 in fees against the proceeds of a pre-bankruptcy sale for which the Debtors received only $100,000.  Id.  R&G states that it first asserted that it has an attorney's lien at "the very commencement of the bankruptcy case," approximately four months after the pre-petition sale.

[4] Fairly read, the Bankruptcy Court's decision does not acknowledge that R&G had liens which were "extinguished" by pre-bankruptcy and post-bankruptcy sales, as set forth in R&G's suggested Questions 3 and 4.  Rather, although referring to an "inchoate lien" when a patent application was filed, 315 B.R. at 214, 215, the Bankruptcy Court held that "an attorney's lien can only exist and become choate when all of the elements are met."  Id. at 215.  The court noted that patents and patent applications did not "rightly constitute a 'judgment, decree or other order' pursuant to M.G.L. c. 221 § 50."  Id.

[5] This Court has not decided whether to grant an interlocutory appeal or whether to certify any questions to the Supreme Judicial Court, and directed that such issues are addressed in this brief.

value of a secured claim of $96,000 (or less, depending on the extent to which the R&G fees are eventually reduced as unreasonable) and an unsecured claim for the same amount.[6]  Under the Debtors' confirmed plan of reorganization, unsecured creditors are guaranteed a dividend, but how many cents on the dollar they will receive will not be known until the conclusion of pending litigation the Creditor Trustees are prosecuting under the plan.  If the Creditor Trustees were to recover the full amount sought in that litigation, there would be sufficient funds to pay unsecured creditors in full.  In that event, it would make no difference whether R&G had a secured claim.

Although the Liquidating Supervisor believes that R&G's positions would work great mischief by indefensibly expanding the scope of the Massachusetts Attorney's Lien Statute, M.G.L. c. 221, § 50 (at times "Section 50"), and must be resisted on appeal, the instant dispute thus may have little or no impact on R&G's ultimate recovery.  The Liquidating Supervisor respectfully requests that the Court dispose of this appeal in a manner that minimizes the expenses imposed on the Debtors' estate.  If this Court decides to grant an interlocutory appeal, it can and should itself resolve the issues decided below without certification of any questions to the Massachusetts Supreme Judicial Court.

## **STATEMENT OF ISSUES**

As set forth in more detail below, R&G has not posed the issues in a balanced manner. For example, with respect to all questions, the only persons allowed to appear before the U.S. Patent and Trademark Office (the "USPTO") are attorneys or agents registered by the USPTO, and their status as a "Massachusetts lawyer" or "Massachusetts attorney" is irrelevant.  The following would be a fairer statement of the questions that R&G would like to present:

---

[6] Although R&G originally asserted a secured claim of approximately $109,000, approximately $13,000 of that amount relates to foreign patents and patent applications, which could not give rise to a secured claim even under R&G's reading of the Massachusetts Attorney's Lien Statute.  See M.G.L. c. 221, § 50 ("before any state or federal department, board or commission").

1.      Does the Virginia attorney's lien statute govern this dispute?

2.      If the Massachusetts attorney's lien statute governs this dispute, does it apply to patent prosecution work?

3.      If the Massachusetts attorney's lien statute governs this dispute, does it provide a lien on proceeds of the sales of patents and patent applications?

### STATEMENT OF THE CASE AND STATEMENT OF FACTS

Relevant facts are discussed where appropriate in the Liquidating Supervisor's Argument.

### SUMMARY OF ARGUMENT

The Bankruptcy Court properly found that Massachusetts law did not apply to proceedings before the USPTO. Appearances before the USPTO could only be made by individuals registered to practice before that body, and their status (or non-status) as "Massachusetts lawyers" was irrelevant. The weight of case law, emerging from federal courts, including in federal question proceedings, establishes that the attorney's lien laws of the forum state are to be applied. A federal agency should be no different, and the Bankruptcy Court properly applied the Virginia lien statute to proceedings before the USPTO. Although there is some support for the proposition that the federal common law should have been applied, the result would have been the same as under the Virginia lien statute -- the absence of the asserted lien.

Even if lawyers from Massachusetts practicing before the USPTO were found to be governed by Massachusetts law, and specifically Section 50 of the Attorney's Lien Statute, they would possess no "charging" attorney's lien as asserted by R&G. Numerous cases have made clear that Section 50 requires a "judgment, decree or other order" before a lien matures or becomes "choate," and that the only proceeds to which a lien can apply under Section 50 are those which have been derived from a judgment, decree or other order. Even R&G admits that it

cannot satisfy that test as to the funds involved in this case, which were proceeds of the sales of patents and patent applications.

In seeking to challenge the weight of the case law, R&G is reduced to misstating the holding of a single Supreme Judicial Court rescript opinion and citing cases interpreting the attorney's lien laws of other states, which have neither the language nor the historical judicial interpretation of Section 50. Relying in part on a different section of the Massachusetts Attorney's Lien Statute, R&G argues that liens under Section 50 attach with equal force to proceeds resulting from the sale of claims (within which R&G would include patent applications) as they do to the proceeds of settlements. That argument, however, is foreclosed by the case law, including two decisions of the Massachusetts Appeals Court, holding that stipulations of dismissal implementing settlements are "judgments" within the meaning of Section 50, and that a lien under Section 50 can therefore apply to the proceeds of such settlements. As already noted, no such argument can be made with respect to the proceeds of the sales of patents or patent applications.

R&G argues that it was not adequately protected under the Bankruptcy Code, but the provisions on which it relies require that it be a secured creditor with a lien, and it had no such status or lien on the proceeds at issue in this case, whether Virginia law, federal common law, or Section 50 is applied.

Finally, because a substantial number of state and federal cases, including state appellate cases, make clear that R&G can have no lien on the proceeds of patent and patent application sales, it is not necessary to certify any questions to the Massachusetts Supreme Judicial Court. Such certification would be needlessly wasteful. To the extent it is inclined to entertain this interlocutory appeal, this Court should find that Massachusetts law does not apply to proceedings

before the USPTO; that even if Massachusetts law applies, Section 50 does not grant a lien on patents and patent applications; and that even if a semantic argument could be made that R&G had a theoretical "inchoate" lien on patent applications, it would have no actual lien on the proceeds of the sales of patents and patent applications since those proceeds did not derive from a "judgment, decree or other order" obtained by R&G.  Indeed, this case could be disposed of on the final ground alone.

## I.    THE BANKRUPTCY COURT PROPERLY FOUND THAT, AS A MATTER OF CONFLICT OF LAWS, MASSACHUSETTS LAW DOES NOT APPLY.

The Bankruptcy Court properly raised a choice-of-law question that had not been addressed by the parties and then correctly answered that question, determining that Massachusetts law does not apply to proceedings before the USPTO.  Although there is some support for the proposition that *federal* common law should determine the existence of a charging lien for appearances before the USPTO, the weight of the case law indicates that the Bankruptcy Court was correct in determining that Virginia substantive law was applicable.  In either event -- whether federal common law or Virginia law is applicable -- the result is the same:  R&G has no charging lien.

### A.    Both federal and Massachusetts choice-of-law rules adopt the Restatement, including its "most significant relationship" test.

As an analytical matter, a bankruptcy court "would normally first determine whose choice-of-law rules to apply:  its own (the 'federal common law') or those of the state in which it sits."  In re Morse Tool, Inc., 108 B.R. 384, 385 (Bankr. D. Mass. 1989).  There is no settled answer to this threshold choice-of-law issue.  "'There is substantial disagreement among the courts as to whether or not a federal court exercising bankruptcy jurisdiction must follow the choice-of-law rules of the state in which it sits or the federal common law choice-of-law rules.'"  In re American Metrocomm Corp., 274 B.R. 641, 659 n.16 (Bankr. D. Del. 2002).  See also

Morse Tool, supra, 108 B.R. at 385 & n.1 (citing cases); In re Gaston & Snow, 243 F.3d 599,

605 & n.6 (2d Cir. 2001) (citing cases).[7]

In the instant case, fortunately, the threshold choice-of-law issue "need not be settled to

resolve this dispute." Morse Tool, 108 B.R. at 385.  "Whether the Court applies the federal

common law or the law of Massachusetts, the result will be the same.  It will apply the 'multiple-

factor,' 'interest analysis' or 'most significant relationship' analysis exemplified by the

Restatement (Second) of Conflict of Laws (1971).'" Id.  See also American Metrocomm, 274

B.R. at 659 n.16 (courts utilizing "the federal common law apply the Restatement's 'most

significant relationship test' to decide choice of law issues"); Bushkin Associates, Inc. v.

Raytheon Co., 393 Mass. 622, 632-33 (1985) (contract); Nile v. Nile, 432 Mass. 390, 401 (2000)

(contract); Cosme v. Whitin Mach. Works, Inc., 417 Mass. 643, 650 (1994) (statute of repose).

## B.    Ropes & Gray mischaracterizes the relationship of this dispute to Massachusetts.

R&G is wrong in arguing that the Massachusetts Attorney's Lien Statute would be

applied under the Restatement's "most significant relationship" test, and, in fact, bases its

argument on two misleading premises.  First, R&G attempts to characterize the instant case as a

dispute over "the 'rights and duties of the parties with respect to an issue in contract.'"

Appellant's Brief at 10.  Second, R&G attempts to cast the dispute as one involving "a

Massachusetts lawyer" who is representing a Massachusetts client before a federal administrative

board that just "happens to be located in another state." Id.  In arguing that "the policies and

---

[7] Not only do different courts reach different conclusions about whether a bankruptcy court should apply state or federal choice-of-law rules, but also they recognize that the application of state rules may vary on a case-by-case basis.  Thus, for example, in In re Gaston & Snow, 243 F.3d at 601-602, 604-07, the Court of Appeals for the Second Circuit determined that a bankruptcy court, like a federal court exercising diversity jurisdiction, should apply Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941), and utilize the choice-of-law rules of the forum state.  At the same time, the court expressly and "necessarily limit[ed its] holding to cases where no significant federal policy, calling for the imposition of a federal conflicts rule, exists." Id. at 607.  See also id. at 602 (decision applicable only to "state law claims that do not implicate federal policy concerns").

interests of Massachusetts roundly outweigh" the interests of any other jurisdiction, R&G claims that "[m]embers of the Massachusetts bar" should be governed by Massachusetts law, at the same time trivializing the federal forum ("the state in which the federal administrative office happens to be located"). Id. at 11.

This is, first of all, not a dispute "over an issue in contract." If the contract (if any) between R&G and the Debtors provided R&G with the lien it now claims over the proceeds of the sales of patents and patents applications, the instant dispute would not be before this Court. The issue would be whether the contractual lien had been properly perfected and preserved by R&G, not whether a lien exists in the first place. To the contrary, R&G is asserting an extra-contractual lien based on a statute which grants liens only in connection with "**proceeding[s]**" and "**judgment[s], decree[s] or other order[s]**" entered or made "**in such proceeding[s].**" R&G's entire claim depends on the argument that the Massachusetts Attorney's Lien Statute applies to a proceeding before the USPTO. Absent such proceeding, there would be no alleged secured claim.[8]  It is undisputed that, as the Bankruptcy Court stated:  "But for the patent application, all of the fees are unsecured."  315 B.R. at 213.

It is misleading for R&G to characterize this as a dispute about the rights of "a Massachusetts lawyer" and "[m]embers of the Massachusetts bar."  Appellant's Brief at 10, 11. A person who is "Massachusetts lawyer" or "member of the Massachusetts bar" is not thereby

---

[8] See Lehigh & N.E. R. Co. v. Finnerty, 61 F.2d 289, 290 (3d Cir. 1932) ("The lien here is a right created by the statute and not by the contract. … The contract fixed the *amount* and not the *existence* of the lien.") (emphasis in original).  Moreover, as noted below in text, even where the law applicable to an attorney's lien is considered under a contract analysis, the courts find that the controlling factor is the state where a retainer agreement is to be performed, which is the state where suit is brought.  See, e.g., In re American Metrocomm Corp., 274 B.R. 641, 659 & n.16, 661 (Bankr. D. Del. 2002) (applying the "most significant relationship" test of Restatement (Second) of Conflict of Laws, with reference to Sections 188 (contract) and 6 (general):  "[F]or the purposes of a choice-of-law analysis, where a client retains an attorney in connection with an action or proceeding, the place of performance is the jurisdiction in which the action or proceeding takes place …. [and] the place of performance is the most substantial factor to be considered in determining which state's law governs the determination of whether [the law firm] has a valid lien.").

entitled to represent patent applicants before the USPTO. The only individuals authorized to practice before the USPTO are those who have satisfied the USPTO's requirements and been registered by the USPTO; moreover, one does not have to be an attorney to be registered. See 35 U.S.C. § 2(b)(2)(D) ("The Office may establish regulations … which may govern the recognition and conduct of agents, attorneys, or other persons representing applicants or other parties before the Office …."); 37 C.F.R. § 11.5 ("A register of attorneys and agents is kept in the Office on which are entered the names of all individuals recognized as entitled to represent applicants ... in the preparation and prosecution of patent applications. Registration in the Office under the provisions of this part shall entitle the individuals so registered to practice before the Office only in patent matters.").

The specific patent attorneys and non-attorney patent agents for whom R&G is seeking fees are not of record on this appeal, but R&G blurs the distinction between attorneys and non-attorneys when it says that this case is about the "Massachusetts bar." This imprecision tracks the R&G website, which lists non-lawyers registered to practice as USPTO agents under the heading of ***"Intellectual Property & Rights Management: Attorneys."*** (Emphasis supplied)[9]

Contrary to R&G's "Statement of Issues," this case therefore does not involve a "Massachusetts lawyer" appearing before a federal administrative agency that "happens to be located in Virginia." Appellant's Brief at 1. More accurately, this case involves appearances

---

[9] The page, as it existed on December 17, 2004, was found at <www.ropesgray.com/practices/attorneys.aspx?SectionID=4&AreaID=000109734003&FocusID=000112840003&IndustryID=>, and is attached to this brief as Attachment A. The biographies of the non-lawyers, found at http://www.ropesgray.com/bios/bio_detail.aspx?AttorneyID=000111888003 (Z. Angela Guo); http://www.ropesgray.com/bios/bio_detail.aspx?AttorneyID=000111955003# (Megan E. Jamroz); http://www.ropesgray.com/bios/bio_detail.aspx?AttorneyID=000111772003 (Yu Lu); http://www.ropesgray.com/bios/bio_detail.aspx?AttorneyID=000111748003 (Melissa S. Rones); and http://www.ropesgray.com/bios/bio_detail.aspx?AttorneyID=000111725003# (Wolfgang Stutius), are attached hereto as Attachment B. While undoubtedly capable, such individuals are not lawyers, much less "Massachusetts lawyers."

before the USPTO (located in Virginia) by USPTO-registered patent attorneys and/or agents (the only individuals permitted to practice before the USPTO) who happen to have desks in Massachusetts.  Membership in the Massachusetts bar is neither necessary nor sufficient for registration with or practice before the USPTO, and any connection with Massachusetts is irrelevant to the appearances before the USPTO which purportedly created the lien.

The USPTO, moreover, has its own Rules of Professional Responsibility which govern members of its bar, including a rule which permits USPTO practitioners to acquire liens granted by law (but not creating any such lien), to enter contingent fee arrangements, or to take an interest in a patent.[10]  There is no claim in this case that R&G and the Debtors entered into any contract by which R&G acquired a lien, assignment, participation, or any other interest in any of the Debtors' patents.[11]

Because the lynchpin of R&G's case is the appearance of its USPTO-registered attorneys and/or agents before the USPTO, it is also misleading to state that "all legal work performed by R&G was performed in Massachusetts."  Appellant's Brief at 3.  Even if the backroom work preparing patent applications had in fact been done entirely in Massachusetts (and there is no record support for that fact), R&G even now necessarily rests its argument on the activity that occurred before the USPTO in Virginia:  "There can be no dispute that, by filing applications for

---

[10] "A practitioner shall not acquire a proprietary interest in the subject matter of a proceeding before the Office which the practitioner is conducting for a client, except that the practitioner may (1) acquire a lien granted by law to secure the practitioner's fee or expenses; or (2) contract with a client for a reasonable contingent fee; or (3) in a patent case, take an interest in the patent as part or all of his or her fee."  37 C.F.R. 10.64.

[11] In addition to not acquiring a contractual lien, R&G, as discussed below, did not acquire a "charging lien" whether Virginia law or the federal common law is deemed applicable.  Although Massachusetts law is not applicable under established choice-of-law principles, the Massachusetts Attorney's Lien Statute also would not grant R&G the "charging lien" which it seeks.  R&G might arguably have asserted a "retaining lien" under Virginia law, but any such lien has been waived and/or is otherwise not relied on by R&G in this case.  See King v. Beale, 198 Va. 802, 806 n.2, 96 S.E.2d 765, 768 n.2 (1957) ("It is well settled that an attorney has a possessory or retaining lien on the papers and documents of his client, that he may retain them until his charges against his client are paid, and that such lien will be lost if he voluntarily parts with possession of them.").  Nor would such a lien have provided R&G with the relief it seeks.

patents with the Patent and Trademark Office ('PTO') on behalf of the Debtors, R&G attorneys made appearances and rendered legal services before a 'federal department, board or commission.'"  Appellant's Brief at 13.  Without an appearance before the USPTO, the Massachusetts Attorney's Lien Statute would not have even arguably been applicable.  But as discussed below, the location of the forum where an attorney makes his or her appearance, rather than the location where backroom work is performed, determines the law applicable to attorney's liens.

> **C.     Massachusetts law does not apply.**

The Bankruptcy Court's decision that the substantive law of Massachusetts did not apply was eminently correct.  The court's application of the substantive law of Virginia conforms to the weight of court decisions, although a few decisions suggest that federal common law would be applicable.  In any event, whether Virginia law or federal common law applies, R&G would not be entitled to the "charging lien" which it seeks.

In American Metrocomm, supra, law firms had provided pre-petition services to the bankrupt, AMC, in federal court actions in both Louisiana and California, 274 B.R. at 646-47, 648, and claimed attorneys' liens permitting the retention of client papers.  With respect to one firm, Duane Morris (DM), the choice of law was at issue.  AMC argued that the dispute should be resolved under California law, which did not recognize such a lien; DM sought application of the laws of Delaware (AMC's state of incorporation and the state of the bankruptcy filing) or Illinois (the location of the DM office where AMC's engagement letter was negotiated and executed, and the location of the case files).  Id. at 659, 660.

The bankruptcy court first concluded that "Delaware is not a relevant jurisdiction."  Id. The court then deemed the fact that the parties negotiated and executed the engagement contract in Illinois to be "insignificant."  Id.  Applying sections 6 and 188 of the Restatement (Second) of

Conflict of Laws, the court next rejected DM's argument (echoed by R&G in the instant case) that work was performed at the location of its office in Illinois, holding that the location of the actions brought by DM controlled the choice-of-law determination:

> As a contract for legal services, all that could possibly be characterized as the subject matter of the Parties' contract are the services Duane Morris provided on behalf of AMC in connection with the AMC-Cisco Litigation. These services were performed in California and Louisiana. Although Duane Morris argues that Illinois was also a place of performance, I disagree. In my view, *for the purposes of a choice-of-law analysis,* where a client retains an attorney in connection with an action or proceeding, *the place of performance is the jurisdiction in which the action or proceeding takes place.*
>
> In my opinion, *the place of performance is the most substantial factor to be considered in determining which state's law governs the determination of whether Duane Morris has a valid lien on the Attorney Files.* Both the unpaid fees and expenses that Duane Morris claims gave rise to its lien, and the Attorney Files to which Duane Morris contends its lien attaches were generated and/or entrusted to Duane Morris in connection to the litigation pending in California and Louisiana. It is appropriate, therefore, that California and/or Louisiana law be applied.

Id. at 660-61 (emphasis supplied).

The court also flatly rejected DM's argument (also echoed in this case by R&G) that the firm expected that the law of Illinois (where the office generating the case was located and where work was done) would control:

> Duane Morris cannot argue that it had a justified expectation that only Illinois law would control. As members of the legal profession, Duane Morris attorneys know, or should know, that they become subject to the professional rules of conduct in each state in which they appear on behalf of a client. Two Illinois attorneys … were admitted pro hac vice … and therefore, agreed to abide by California's Rules of Professional Conduct. One of the attorneys … is a member of the California Bar. … AMC's action against Cisco was pending in Louisiana. Therefore, Duane Morris should have reasonably expected that Louisiana and California might govern the determination of whether it has a valid lien on the Attorney Files.

Id. at 662. Finally, the court rejected DM's argument (again echoed by R&G) that Illinois had an interest in protecting its attorneys:

> California and Louisiana have a greater interest in having their laws applied to the
> determination of Duane Morris' lien than Delaware or Illinois. … Although
> Illinois may have an interest in protecting the expectations of [its] attorneys in
> getting paid, Louisiana and California have a greater interest in regulating the
> conduct of attorneys appearing before their courts to ensure that the attorneys'
> clients are properly represented and that the attorneys act in the clients' best
> interests. … *[A]ny interest of Illinois in protecting resident attorneys is offset by*
> *Duane Morris' knowledge that it would be performing services for AMC in*
> *California and Louisiana and thereby become subject to the professional*
> *standards of those jurisdictions*

Id. (emphasis supplied).  In the instant case, the rejection of Massachusetts law is even more

clearly warranted than was the rejection of Illinois law in <u>American Metrocomm</u>.  The R&G

attorneys (and non-attorneys) cannot even claim that they appeared pro hac vice in the USPTO

proceedings as Massachusetts attorneys; they appeared before the USPTO in Virginia as

members of the USPTO bar.

A similar result was reached in <u>Great Lakes Transit Corp. v. Marceau</u>, 154 F.2d 623 (2d

Cir. 1946), where Illinois attorneys were retained in Illinois to bring an action in New York.  <u>Id.</u>

at 624, 625.  The court found the Illinois lien statute, on which one attorney based a claim, to be

"irrelevant" despite the fact the retainer agreement was executed in Illinois by Illinois attorneys:

"'all matters connected with its performance *** are regulated by the law of the place where the

contract *** is to be performed.'" <u>Id.</u> (ellipses in original).  "[T]he parties to the … retainer

intended that any action on the claim should be brought in New York," <u>id.,</u> and "New York 'law'

governs." <u>Id.</u> at 626.

Similarly, in <u>Peresipka v. Elgin, Joliet & Eastern Ry. Co.</u>, 231 F.2d 268 (7th Cir. 1956),

the court determined that the Illinois Lien Act governed where an Illinois attorney was retained

to bring suit in Illinois, despite the fact that the retainer agreement was allegedly signed in

Indiana.  The controlling factor was where the parties intended that suit be brought:

> [I]rrespective of whether the contract was signed in Indiana or Illinois, the record
> unmistakably discloses that it was to be performed in the latter state. … "If [the

attorney, who was discharged after filing suit] had fully performed his contract, Illinois would have been the place of performance ….”

Id. at 271-72.[12]

The law of the state where suit was to be brought was also applied on an “equitable lien” theory in Underwood v. Phillips Petroleum Co., 155 F.2d 372 (10th Cir. 1946), where a Texas law firm (Underwood) was retained to bring suit in federal court in Oklahoma and executed an agreement that it would recover its fee out of the recovery.  Id. at 372, 373.  The court stated:

> [T]he actions were to be prosecuted in Oklahoma, and the Underwood firm and [the plaintiff client] contemplated that if recovery were had, the fund would come into existence in Oklahoma.  Under such circumstances, it is reasonable to infer that they intended the contract to be performed in Oklahoma and to be interpreted according to the laws of that state.

Id. at 374.  The court reasoned that the “validity and effect of a lien on a chattel are determined by the law of the state where the chattel is at the time when the pledge or lien is created.”  Id. The “fund against which the several claims are asserted came into existence in Oklahoma when Phillips [the defendant] paid the amount due on the judgments into court.”  Id. at 374.  Because Oklahoma recognized equitable liens, “the Underwood firm acquired an equitable lien on the fund when it came into existence, since the fund was in Oklahoma when the lien was created.” Id. at 374-75.

---

[12] In its discussion, the court also cited with approval an Illinois case, Smith v. Louisville & Nashville RR. Co., 313 Ill. App. 396, 40 N.E.2d 539 (Ill. App. Ct), rev'd on other grounds, 381 Ill. 55, 44 N.E.2d. 841 (1942), where Illinois law was held to apply to an attorney's lien claim by, among others, a Missouri attorney who had been retained in Ohio to file suit in Illinois.  The court in Smith rejected the defense that Ohio law governed:

> “The contract was to be performed in Illinois….

> ‘The suit having once been filed in a Court of this State [Illinois], such lien, under the Illinois Statute, at once attached to the cause of action ….’”

231 F.2d at 272.

Other cases are in accord.  See, e.g., Person v. Lemelson, 1990 WL 144208 at *3 (S.D.N.Y. 1990) (granting transfer of venue of attorney's suit for fees to federal court in Chicago where patent action was originally filed:  "The inquiry will necessarily involve examining Person's [the attorney] compliance with local court rules in the Chicago action.  The validity of Person's contract claim may well hinge on whether Person was ever technically replaced in the Chicago action or if an attorney's lien was properly filed under local court rules."); In re Military Circle Pet Center #94, Inc., 181 B.R. 282, 285 (Bankr. E.D. Va. 1994) (attorney Smith represented creditor in bankruptcy proceeding in Virginia, resulting in recovery of cash and promissory note:  "[S]ince the settlement and work done by Smith was conducted in Virginia, the Virginia lien statute should apply to Smith's claim of his attorney's lien against the note."); Lehigh & N.E. R. Co. v. Finnerty, 61 F.2d 289, 290 (3rd Cir. 1932) ("[T]he employment of an attorney of New Jersey and the bringing of a suit in New Jersey indicate that the parties intended from the first that the suit should be brought in that state.  And being brought there, the laws of that state control as to the lien."); Hoxsey v. Hoffpauir, 180 F.2d 84, 86 (5th Cir. 1950) (attorney's lien claimed with respect to federal court action in New York:  "[B]y his employment of counsel and the institution of suit in the Court in New York the appellant became subject to the statutes of New York regulating and controlling the attorney-client relationship with reference to the fixing and enforcing of the respective rights between the parties…. Federal Courts sitting in a State enforce that State's statutes creating attorney's liens."); In re Fitterer Engineering Associates, Inc., 27 B.R. 878, 879-80 (Bankr. E.D. Mich. 1983) (patent infringement litigation, which can be brought only in federal court:  "existence and effect of an attorneys' lien is governed by the law of the state in which legal services are to be performed.").

R&G argues variously that the authority cited by the Bankruptcy Court "explicitly excludes from its scope the application of state attorney's lien law in federal proceedings," that the "enforcement of an attorney's lien in federal court" is not discussed, that the USPTO proceedings "involved no question of Virginia state law" or "rules of trial administration," and that the "entire proceedings were governed by federal law and federal rules." Appellant's Brief at 8-9. R&G suggests that the Virginia Attorney's Lien Statute could properly be applied to suits brought in state courts (because then "attorneys would expect that state's law to have an impact on their relationship with the client"), but asserts that the application of Virginia law in this case was a violation of due process. Id. at 12-13. R&G's arguments flout settled authority. As noted above, the substantive attorney's lien laws of the states in which federal courts sit apply to attorneys and clients in federal court, despite the fact that the proceedings are governed by "federal rules of trial administration." See, e.g., American Metrocomm; Person; Military Circle; Hoxsey; Fitterer. This is in fact true with respect to actions to enforce patents, the very subject matter governed by the "federal law" at issue in the instant case. See, e.g., Person; Fitterer. No reasoned distinction can be drawn between the application of Virginia's lien law to proceedings before the USPTO, on the one hand, and the application of any state's attorney's lien law to a federal cause of action in a federal court sitting in that state.[13] R&G knew that the USPTO proceedings would necessarily take place within Virginia, and, as noted above, a host of cases have noted that the state in which a federal tribunal sits has the "*most* significant relationship" to

---

[13] R&G's argument would thus require that this Court disregard or overturn the settled body of law granting liens under the laws of the forum state to attorneys bringing federal actions in federal court proceedings.

an attorney's lien claim, to say nothing of the "minimal contacts" necessary to pass constitutional muster.[14]

### D. There is no "charging lien" in this case under either Virginia law or federal common law.

It is undisputed that the Virginia Attorney's Lien Statute would not grant R&G the "charging lien" which it seeks, for that statute by its terms applies only to an action sounding in tort, for liquidated or unliquidated damages on a contract, or for annulment or divorce. In re Engage, Inc.. 315 B.R. at 213.

R&G might conceivably have argued – contrary to the majority view that the law of the forum state applies -- that the Bankruptcy Court should have applied *federal* law with regard to the existence of an attorney's lien. Cf. Misek-Falkoff v. IBM, 829 F. Supp. 660, 663 (S.D.N.Y. 1993) ("The nature and extent of an attorney's lien is controlled – certainly in a federal question case, and perhaps in all cases in federal court – by federal law."); Renaud v. General Motors Corp., 316 F. Supp. 2d 77, 81 (D. Mass. 2004) (citing Misek-Falkoff: "[I]ssues relating to the enforcement of an attorney's lien [are], in a case before this court based on federal question jurisdiction, governed by federal law."). Unfortunately for R&G, however, there is no federal statute or common law creating attorney's liens. See, e.g., Hoxsey, 180 F.2d at 86 ("It is the general rule that *while the Federal law provides no such remedy*, Federal Courts sitting in a State enforce that State's statutes creating attorney's liens.") (emphasis supplied); Adams, George, Lee, Schulte, & Ward, P.A. v. Westinghouse Elec. Corp., 597 F.2d 570, 573 (5th Cir. 1979) ("No such lien is recognized under federal common law."); Anderson v. Farmers Co-op

---

[14] Two cases on which R&G primarily relies, Hedman, Gibson & Costigan, P.C. v. Tri-Tech Systems Int'l, Inc., 1994 WL 18536 (S.D.N.Y. 1994), modified by 1995 WL 555702 (S.D.N.Y. 1995), and Schroeder, Siegfried, Ryan & Vidas v. Modern Elec. Prods., Inc., 295 N.W.2d 514 (Minn. 1980), which applied the attorney's lien statutes of, respectively, New York and Minnesota to USPTO proceedings, did not consider the conflict-of-laws question raised by the Bankruptcy Court.

Elevator Ass'n, Inc., 874 F. Supp. 989, 991(D. Neb. 1995) ("*While federal common law does not recognize the attorney's lien*, federal courts sitting in a state enforce that state's statute creating attorneys' liens.") (emphasis supplied). Thus, in sum, there is no "charging lien" of the sort asserted by R&G whether the applicable substantive law is federal common law or the law of Virginia, the state where the USPTO was sitting.

## II.    EVEN IF MASSACHUSETTS LAW APPLIES, THE MASSACHUSETTS ATTORNEY'S LIEN STATUTE DOES NOT CREATE THE LIEN CLAIMED BY R&G.

### A.    The Bankruptcy Court correctly determined that the only proceeds on which Section 50 provided a lien were those whose payment was compelled by a "judgment, decree or other order."

The Bankruptcy Court accepted R&G's argument that Section 50 applied to federal administrative proceedings. 315 B.R. at 213-14 (proceedings before a "federal department, board or commission."). That, however, was not sufficient, for the Bankruptcy Court concluded that "patent prosecution work" did not "fall[] within the purview of the unambiguous terms of the statute." Id. at 214. The Bankruptcy Court found that Section 50 was only applicable where a "judgment, decree or other order" required or triggered the payment of the funds to which the lien could attach. See id. at 214, citing Torphy v. Reder, 357 Mass. 153, 156 (1970) ("the lien 'binds the *judgment or money decree* for payment of expenses incurred and for services rendered by an attorney with respect to the particular action or suit.") (emphasis in Bankruptcy Court decision); id. at 216-17, citing In re Leading Edge Prods., 121 B.R. 128, 131 (Bankr. D. Mass. 1990) (statutory phrase "proceeds derived therefrom" applies to "judgment, decree or other order" and therefore lien attaches "only to proceeds of a judgment and not to proceeds of the action.").

The grant of a patent is neither a judgment, decree or order. As the Bankruptcy Court correctly reasoned, a "patent does not order anyone to do anything or pay any money." Id. at

214. A patent merely "grants the patent holder the right to exclude others from making, using, offering for sale, selling or importing a particular invention or process." Id. "[A]llowance of the applications did not itself require or trigger the payment of any money." Id. Thus, "the patents, patent applications and the proceeds deriving therefrom" did not "constitute a 'judgment, decree or other order' pursuant to M.G.L. c. 221, § 50." Id. at 215. Any "proceeds" in this case "do not stem from the actual order of the Patent Office, but rather from the sale of the underlying intellectual property protected by the patent." Id. at 214. "[I]t thus follows that no charging lien attached" to those proceeds. Id. at 214.

The Bankruptcy Court's reasoning is consistent with a series of state and federal decisions applying Section 50. For there to be any attorney's lien on funds, there must be a "judgment, decree or other order" which has compelled the payment of those funds for the client's benefit.

Thus, the court in In re Leading Edge Prods., Inc., 121 B.R. 128, 131 (Bankr. D. Mass. 1990), concluded that the only "proceeds" to which a lien could attach were those "derived from" a "judgment, decree or other order," and not those somehow otherwise arguably derived from a client's cause of action or claim:

> [The attorney] would have the Court eliminate the reference to judgment, decree or order in the statute. Although from a grammatical point of view it is not inconceivable that the phrase, 'the proceeds derived therefrom' has dual antecedents, the Court finds that in fact that phrase modifies the prior phrase, 'upon the judgment, decree or other order…' only.

As a result, of course, R&G would have no lien in this case, because all of the funds at issue in this case resulted from **sales** of intellectual property (including some before patents were even granted), and no proceeds derived from any order achieved by R&G compelling a third party to make payments to the Debtors.

R&G's riposte is that <u>Leading Edge</u> is "plainly incorrect," coupled with the *ipse dixit* assertion that Section 50 contains "serial commas" such that the section provides a lien on the proceeds "of all of the foregoing" (including claims), and not just on the proceeds of a judgment, decree or order.  Appellant's Brief at 21, 22.  Unfortunately for R&G, the courts do not agree.

The requirement that the proceeds at issue be the direct result of a court order was strongly indicated by the Court of Appeals in <u>Cohen v. Lindsey</u>, 38 Mass. App. Ct. 1, 644 N.E.2d 250 (Mass. App. Ct. 1995).  An attorney obtained a preliminary injunction in an action for eviction and back rent which required the tenant to pay money into an escrow account pending final determination of the proceeding.  38 Mass. App. Ct. at 2, 3.  The attorney asserted a lien on the funds; the FDIC, a competing claimant, asserted that no such lien existed:

> The FDIC, citing several older cases, contends that the statutory attorney's lien only exists after the entry of a final judgment in the client's favor. … [However,] the modern version of § 50 as appearing in the 1945 statute *supra*, permitted a lien on "the judgment, decree or *other order in his client's favor*."…
>
> The sweep of the statute now includes any type of court order obtained in a client's favor. … In the instant case, the judge ordered [the tenant] to pay $10,000 per month into the fund …. The order established the fund as potential security for [the client], pending an entry of final judgment in the case.  The effect of the order was the same as an equitable attachment to reach and apply …. That ***the order actually required a transfer of funds in favor of [the attorney's] client*** differentiates the order from a simple attachment, which might not be the occasion of giving ground for an attorney's lien.

<u>Id.</u> at 4-5 (bold emphasis supplied).  Section 50 was triggered by an order which required the payment of the funds on which the lien was asserted.

Confronting an attorney's claim to a lien on settlement proceeds, the Massachusetts Appeals Court in <u>Craft v. Kane</u>, 51 Mass. App. Ct. 648, 747 N.E.2d 748 (Mass. App. Ct. 2001), interpreted Section 50 as reaching only those proceeds which derived from a judgment, order or other decree, as did the Bankruptcy Court in <u>Leading Edge</u>.  Thus, the Appeals Court found that while an attorney had an "inchoate lien … upon his client's cause of action … as of the

commencement of an authorized action," 51 Mass. App. Ct. at 651, the only proceeds to which

that lien could attach were those resulting from a court order:

> [The lien] becomes *choate*, and attaches to, "any type of court order
> [subsequently] obtained in a client's favor," *Cohen v. Lindsey*, *supra*, and the
> "proceeds derived therefrom."  G.L. c. 221, § 50.

Id. (emphasis in original).  There were two "orders" or "judgments" in the suit filed by the

attorney in Craft which satisfied the statute.  The first was an interlocutory order directing that

fire insurance proceeds be held in a constructive trust for the client:

> The interlocutory order … was an order in … [the] client's favor, with the result
> that [the attorney's] inchoate lien (arising upon the filing of the action) became
> choate, or matured, at the time of the order.  See *In re Albert*, 206 B.R. 636, 639
> (Bankr. D. Mass. 1997) ("When an attorney files an action, an inchoate lien arises
> in the attorney's favor…. The lien becomes choate when *a judgment, decree, or
> other order is entered* in the client's favor, and attaches to any proceeds *derived
> therefrom*.")

Id. (emphasis supplied).

Even more instructive was the Appeals Court's interpretation of Section 50 with regard to

the subsequent settlement of the entire case, where the client (represented by successor counsel),

was paid $7,500 and a stipulation of dismissal with prejudice filed.  The court found that the

attorney could enforce his lien against those settlement proceeds, ***not*** because they somehow

were proceeds of the cause of action he filed, but rather because the stipulation of dismissal

constituted a "judgment" within the meaning of Section 50 and the settlement proceeds derived

from that judgment:

> The docket sheet indicates that this case was disposed of by a stipulation of
> dismissal.  Under Mass.R.Civ.P. 58 … a stipulation of dismissal constitutes a
> judgment.  … Rule 58(a) states …. "… when any party files … a notice or
> stipulation of dismissal pursuant to Rule 41(a)(1), the agreement, notice, or
> stipulation … shall, upon being filed, constitute the judgment …"  Because G.L.
> c. 221, § 50, expressly refers to judgments "entered or made," the stipulation of
> dismissal constituted a judgment within the meaning of the attorney's lien statute.
> … [T]he lien attached to the $7,500 arising under the stipulation of dismissal….

Id. at 652-53.  If R&G's theory -- that an attorney has a roving lien over any funds that in any way derive from his client's claim -- were correct, there would have been no need for the Appeals Court in Craft to find the requisite "judgment, decree or other order" which generated the proceeds.  But the Appeals Court, in discussing both the interlocutory order and the settlement, read Section 50 in the same way as did the court in Leading Edge -- the only "proceeds" to which a lien can attach are those derived from a "judgment, decree or other order."  The Supreme Judicial Court denied further appellate review of the Appeals Court decision.  434 Mass. 1108, 757 N.E.2d 730 (2001).

        The Appeals Court again took the same approach in Kourouvacilis v. AFSCME, 53 Mass. App. Ct. 1116, 761 N.E.2d 1013 (Mass. App. Ct. 2002) (unpublished opinion available on Westlaw), where the Appeals Court reversed a trial court decision that a settlement and stipulation of dismissal of claims "did not satisfy the attorney's lien statute, G.L. c. 221, § 50, because no judgment or decree was entered in the plaintiff's favor within the meaning of the statute."  761 N.E.2d at 1013.  The Appeals Court, citing Craft, reiterated its holding "that a stipulation of dismissal constitutes a judgment within the meaning of the attorney's lien statute."  Id.

        Similarly, in Phalon v. Technical Communications Corp., 1999 WL 1326754 (Mass. Super. 1999), a law firm (HAS) brought suit on behalf of its client against TCC.  HAS's client itself negotiated a settlement without the knowledge of HAS, pursuant to which TCC wired $300,000 to the client's wholly owned corporation.  See id. at **1.  The court found that the "inchoate attorney's lien takes effect from the authorized commencement of the action and matures upon judgment favorable to the plaintiff."  Id. at **3.  Citing Leading Edge, the court stated that the "'lien becomes choate when *a judgment, decree or other order is entered in the*

*client's favor … [T]he lien attached to 'the proceeds derived therefrom*.'" Id. (emphasis

supplied).  The defendant TCC (which had disbursed the funds without regard to any lien)

"denie[d] the existence of an attorney's lien where, as here, the parties settled." Id.  As did the

courts in Craft and Cohen, the court found it necessary to identify a judgment or order to satisfy

Section 50, finding (as did the court in Craft) that the stipulation of dismissal implementing the

settlement constituted the requisite "judgment":

> A lien matures upon a judgment, decree or any type of court order obtained in a
> client's favor.  See G.L. c. 221, § 50; *Cohen v. Lindsey*, 38 Mass. App. Ct. at 4;
> 644 N.E.2d 250.  Stipulations of dismissal constitute judgments under Mass. R.
> Civ. P. 58.  In this case, the Stipulation of Dismissal makes express reference to
> the Settlement Agreement whereby [the client] obtained control of TCC and the
> right to reimbursement of up to $395,000 in attorneys fees and expenses.  *It
> therefore constitutes a judgment* in [the client's] favor within the meaning of
> G.L. c. 221, § 50.  See *Cohen, supra,* 38 Mass. App. Ct. at 4-5, 644 N.E.2d 250.
>
> … A narrow construction of the language "*order in his client's favor*" to exclude
> situations, like the present case, which involve dismissal with prejudice pursuant
> to a settlement agreement *which provides for the payment of monies to or on
> behalf of the plaintiff* would defeat the principal purpose of the Attorney's Lien
> Statute.

Id. at **3, **4 (footnote omitted).[15]

Section 50 was also at issue in In re Hollingsworth, 198 B.R. 832 (Bankr. M.D. Fla.

1996), where attorneys were claiming a lien on the proceeds of the sale of commercial property

by a receiver.  The court noted that the "the *funds involved were not awarded by a judgment,

decree or order of the Court*, but from liquidation of the sale of the commercial property." Id. at

835.  The attorneys' argument that the appointment of the receiver provided the requisite

judgment in favor of the client was rejected on two grounds.  First, another attorney had filed the

---

[15] Prior to the Appeals Court decisions in Craft and Kourouvacilis, and the SJC's determination not to grant further
appeal of Craft, a Superior Court judge held that the attorney's lien statute applied "to settlements of suits,
notwithstanding the lack of any 'judgment, decree or other order.'"  See Sadowsky v. Bishop, 1998 WL 1182098 at
**1 (Mass. Super. 1998).  Since Craft, it is clear that the Massachusetts courts have construed the statutory language
to require that the proceeds on which a lien is claimed have derived from a "judgment, decree or other order."

motion to appoint the receiver, and second, the appointment of the receiver was "***not tantamount to a judgment in favor of the [client] because it lacked persuasive force.***" Id.  See also Torphy v. Reder, 357 Mass. 153, 156, 257 N.E.2d 435, 437-38 (1970) ("[T]he type of lien created by G.L. c. 221, § 50, is a charging lien which binds ***the judgment or money decree*** for payment of expenses incurred and for services rendered by an attorney with respect to the particular action or suit") (emphasis supplied); In re Albert, 206 B.R. 636, 639 (Bankr. D. Mass. 1997) ("The lien becomes choate ***when a judgment, decree, or other order is entered in the client's favor, and attaches to any proceeds derived therefrom***") (emphasis supplied); In re Rothwell, 159 B.R. 374, 379 (Bankr. D. Mass. 1993) (referring to "a charging lien which binds the judgment or money decree" and stating that a "lien becomes choate when a judgment, decree or other order is entered in the client's favor ('upon the judgment, decree etc.').  Finally, the lien attaches to 'the proceeds derived therefrom…'"); PGR Mgmt. Co., Inc. v. Credle, 427 Mass. 636, 640, 694 N.E.2d 1273, 1276 (1998) ("[P]ursuant to G.L. c. 221, § 50, an inchoate lien in favor of the tenant's attorney arose upon the filing of the tenant's counterclaim and matured upon entry of judgment for the tenant.").

> **B.    Even R&G must acknowledge that this case does not involve proceeds derived from a "judgment, decree or other order."**

R&G does not, and cannot, dispute the fact that the so-called "claims" contained in patent applications to the USPTO could never have resulted in the USPTO's issuance of money judgments or other orders awarding funds to the Debtors.  Because a patent, even when granted, "does not order anyone to do anything or pay any money," 315 B.R. at 214, patent application proceedings (even if allegedly making "claims" to an administrative agency[16]) can never lead to

---

[16] The juxtaposition of the word "claim" in Section 50 with the terms of art "cause of action" and "counterclaim" indicates that the statutory intent was to address a "claim" made against a third person, that is, the sort of "claim" which can lead to a money judgment or other order forcing the payment of funds for the benefit of the client.  See,

proceeds on which a lien attaches under Section 50.  Common sense dictates that patent

application proceedings before the USPTO are therefore not within the intended scope of Section

50 in the first instance.

Even if one were to ignore the fact that USPTO proceedings could never lead to the

requisite judgment, decree or other order awarding money to the Debtors, and make the semantic

argument that R&G had an "inchoate" lien under Section 50 on the Debtor's patent applications,

R&G could have no lien on any of the proceeds of the *sales* of patents and patent applications --

the only funds at issue in this case.  As both state and federal courts have noted, the only

"proceeds" on which a lien can be asserted are those which have derived from a "judgment,

decree or other order." R&G must acknowledge that there are no such proceeds in this case.[17]

As the Bankruptcy Court noted, "[e]ven if a patent could be deemed an order, however, the

proceeds derived from its sale do not stem from the actual order of the Patent Office, but rather

from the sale of the underlying intellectual property protected by the patent."  315 B.R. at 214.

See also Hollingsworth, 198 B.R. at 835 ("the funds involved were not awarded by a judgment,

decree or order of the Court, but from liquidation of the sale of the commercial property").  The

same is true, a fortiori, with respect to any sales of patent applications:  the USPTO did not order

that any payments be made to, or create any fund for the benefit of, the Debtors.[18]

---

e.g., Banushi v. Dorfman, 438 Mass. 242, 244 (2002) ("In considering the language of the statute, the doctrine of ejusdem generis is applicable:  'Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerating by the preceding specific words.'").  For this reason, also, Section 50 does not apply to patent applications to the USPTO.  See also p. 30 infra.

[17] Because there is no way of arguing that the proceeds in this case derived from a judgment, decree or other order achieved by R&G, R&G strenuously argues that "the proceeds derived therefrom" applies to "cause of action, counterclaim or claim."  This is not how the statute has been, or should be, construed.  Moreover, as discussed in footnote 16 and the accompanying text, such a construction would avail R&G nothing in this case.

[18] For reasons set forth in text, the Bankruptcy Court likely gave too much credence to R&G's argument that it held an "inchoate lien" on patent applications.  315 B.R. at 214-215.  Because a USPTO patent proceeding could never lead to proceeds deriving from a USPTO "judgment, decree or other order" within the meaning of Section 50, any

Thus, it is in the end unnecessary to determine whether patent applications to the USPTO might arguably constitute "claims" to an administrative agency within the scope of Section 50, because the funds at issue in this case clearly are not proceeds derived from any judgment, decree or other order, as is required by recent Massachusetts and federal decisions. That can and should be the end of the case.

### C.    R&G mischaracterizes <u>Webber v. Napolitano</u>

In arguing that the Bankruptcy Court improperly interpreted Section 50, R&G relies on a 1947 Supreme Judicial Court case, <u>Webber v. Napolitano</u>, 320 Mass. 765 (1947), and on two decisions interpreting the attorney's lien statutes of other states. Its reliance is misplaced.

R&G complains that the Bankruptcy Court "ignored" the <u>Webber</u> case. Appellant's Brief at 15. If anything, the Bankruptcy Court's decision not to discuss the case was designed to save R&G embarrassment.[19]

R&G unequivocally asserted to the Bankruptcy Court that "[i]n *Webber*, … the Supreme Judicial Court held that the current attorney's lien statute applies to an administrative proceeding to obtain a lodging-house license, and that the lien attached to the license granted. The Supreme Judicial Court apparently considered these to be noncontroversial propositions, affirming the Superior Court in a rescript opinion." Response of Ropes & Gray LLP to Objection of the Liquidating Supervisor to the Secured Claim of Ropes & Gray LLP ("R&G Bank. Ct. Response") (Bankr. Ct. Docket No. 563), at 3. Yet again in this Court, R&G argues that the

---

alleged "inchoate lien" gained by R&G when it initiated a patent application would be meaningless and applying Section 50 to USPTO patent proceedings in the first instance is not sensible.

[19] In briefing this issue below, the Liquidating Supervisor pointed out that R&G had misrepresented the rescript opinion in <u>Webber</u>. <u>See</u> "Reply of the Liquidating Supervisor to the Response of Ropes & Gray LLP to the Objection to the Secured Claim of Ropes & Gray LLP" at 1-3 (Bankr. Ct. Docket No. 569). At the hearing below, the Liquidating Supervisor again pointed out that <u>Webber</u> did not remotely support R&G's position. Transcript of 9/21/04 Hearing at 7-8, 32. R&G's suggestion that the Bankruptcy Court "ignored" <u>Webber</u> incorrectly presupposes that the rescript opinion had sufficient relevance to warrant being mentioned.

"Supreme Judicial Court recognized that an attorney is entitled to a lien on economically valuable assets that are created by virtue of the attorney's services.  Indeed, *the Court acknowledged the existence of the lien ... under the Massachusetts Attorney's Lien Statute….*" Appellant's Brief at 16-17 (emphasis supplied).

Even after its error has been called to its attention in briefs and oral argument below, R&G stubbornly persists in misstating the <u>Webber</u> decision.  Notwithstanding R&G's fanciful reading of the case, the Supreme Judicial Court there expressly, conspicuously and unambiguously declined to hold that a lien could attach to a license and certainly did not "acknowledge[] the existence of the lien … under the Massachusetts Attorney's Lien Statute." In <u>Webber</u>, the plaintiff-attorney sued the defendant-client for $250 for allegedly unpaid legal services rendered in connection with obtaining a lodging house license.  320 Mass. at 765.  The defendant brought a counterclaim alleging that the plaintiff "unreasonably, maliciously and without right" retained the lodging house license for twenty days and sought damages for income lost during that period.  <u>Id.</u>  The attorney replied to the counterclaim by admitting that he had retained the license, denied the alleged length of the period of retention, denied that the retention was unreasonable, and asserted Section 50 as a defense to his retention of the license.  <u>See</u> <u>id.</u> The Superior Court ruled that the client owed the attorney the claimed $250 and dismissed the counterclaim after finding that the attorney did not withhold the license "unreasonably, maliciously and without right."  <u>Id.</u>  There is no indication that the Superior Court ruled that the attorney held an attorney's lien against the license.

The Supreme Judicial Court affirmed the Superior Court's rulings and stated that the admitted facts, which included the attorney's admission that he withheld the license, "did not require a finding that the plaintiff retained the license unreasonably, maliciously and without

merit. ***This is true whether or not the plaintiff had any right under…c. 221.***" *Id.* at 765-66 (emphasis supplied). That statement represents the totality of the Court's discussion of the Massachusetts Attorney's Lien Statute. At no point did the Court, as R&G asserts, "acknowledge[] the existence of [a] lien … under the Massachusetts Attorney's Lien Statute." The Supreme Judicial Court explicitly declined to hold that a statutory lien attached to a license.

It is telling that R&G can cite -- or miscite -- no other Massachusetts case for the proposition that a Section 50 lien attaches to a so-called "economically valuable asset" that is "created by virtue of [an] attorney's services," as opposed to cases imposing a lien on the proceeds of a judgment, decree or other order compelling money payments. Appellant's Brief at 17. This is particularly telling since Section 50 has been in effect in its current form for almost 60 years, since 1945, and there have been countless licenses, permits, and other "economically valuable assets" that attorneys have applied for on behalf of their clients in the Commonwealth during that time period.

### D.    Decisions interpreting the statutes of other states prove nothing.

In order to find support for its unwarranted and expansive reading of Section 50, R&G is forced to rely on decisions in two other states interpreting statutes with demonstrably broader scopes. R&G accuses the Bankruptcy Court of "hypertechnical statutory analysis" in distinguishing these cases. Appellant's Brief at 19. There is, however, nothing "hypertechnical" about construing statutory words and phrases according to their common usages and in adhering to the established interpretations of Section 50.

For example, there can be no dispute that a patent could reasonably be considered "property involved in or affected by any . . . [patent] proceeding," the test under the Minnesota statute. Schroeder, Siegfried, Ryan & Vidas v. Modern Elec. Prods., Inc., 295 N.W.2d 514 (Minn. 1980). Similarly, "[t]he language of [New York's statute] reveals a legislative intent to

apply [that statute] broadly within the United States," and a lien in New York attaches "to a verdict, report, determination, decision, judgment or final order." Hedman, Gibson & Costigan, P.C. v. Tri-Tech Sys. Inter'l Inc., No. 92 Civ. 2757, 1994 WL 18536 (S.D.N.Y. 1994) (construing N.Y. Judiciary Law § 475 and applying lien to domestic patents).[20]  In contrast, the Massachusetts statute does not apply to a "verdict, report, determination [or] decision," but instead requires a "judgment, decree or other order," with the further requirement that such judgment or order create the fund of money on which the lien is claimed.  R&G's efforts to have the Court construe Section 50 as identical to the New York statute would effectively ignore the different language of the two statutes, render the additional terminology in the New York statute mere surplusage, and ignore prior interpretations of Section 50.

> **E.    Section 50A, if anything, confirms that Section 50 does not apply to patents and patent applications.**

R&G argues that M.G.L. c. 221, § 50A supports its position that an attorney's lien "attaches to *any* proceeds of a 'claim, counterclaim, or cause of action.'" Appellant's Brief at 22-23 (emphasis supplied).  This argument was not presented to the Bankruptcy Court and should not be considered here.  In any event, it is without merit.  If anything, Section 50A supports the position of the Liquidating Supervisor.

Section 50A, first of all, does not support the proposition that Section 50 applies to all arguable proceeds of a claim (assuming, albeit incorrectly, that a patent application is a "claim" within the meaning of the statute), regardless of whether there is a "judgment, decree or other order" from which those proceeds are derived.  Section 50, of course, protects attorneys whose

---

[20] It is instructive that R&G touts the decision of the United States District Court for the Southern District of New York interpreting a different state's statute as "persuasive authority," Appellant's Brief at 17, while still requesting that the interpretation of Section 50 be certified to the Massachusetts Supreme Judicial Court in the face of Bankruptcy Court, Federal District Court, Massachusetts Appeals Court, and Massachusetts Superior Court decisions.

faithless clients have received funds through settlements, and Section 50A accordingly explicitly addresses the corollary situation where the Commonwealth or a political subdivision has settled a claim by making payment to the client.  As discussed above, however, the courts recognize that the proceeds of settlements fall within the language of Section 50 because settlements are implemented through "judgments."  Nothing in Section 50 or 50A negates the requirement of a "judgment, decree or other order" or extends Section 50 to proceeds derived from anything other than a "judgment, decree or other order" (which includes a judicial settlement).

Section 50A, in fact, supports the position that a patent is not a "claim" within the meaning of Section 50.  Section 50A contemplates "payment… in full or in settlement of any claim," which indicates that the term "claim," as used in Section 50 and 50A, in fact means a claim against a third person, such as the Commonwealth or a municipality, that can be paid or settled.  A license or patent application, in contrast, is not a "claim" which can be paid in full or settled by the Commonwealth or a municipality.[21]  See also n.16 supra.

### F.    Section 50 distinguishes between funds created by "judgments, decrees or other orders" (which includes settlements) and funds arising from the sale of claims.

R&G's final argument with respect to Section 50 is that it would be "absurd and wholly inconsistent with the statutory scheme" if the "attorney's lien were to disappear upon any pre-ruling sale of the claim or cause of action, but not on a settlement of the same claim or cause of action."  Appellant's Brief at 24.  As discussed above, a settlement is considered a "judgment" within the meaning of Section 50, while in the instant case R&G must concede that the sale of

---

[21] It should also be noted that Section 50A was apparently derived from language suggested by the Corporation Counsel of the City of Boston as an "add-on" to whatever amendment of the attorney's lien statute was enacted, rather than being drafted in careful harmony with Section 50.  See Letter from Corporation Counsel, City of Boston, to Hon. John Mackey, Chairman, Committee on the Judiciary (February 2, 1945) (on file with the Massachusetts Archives) (Attachment C).

patents and patent applications is not even arguably a "judgment, decree or other order." The issue in the instant case is thus not whether a lien "disappears," but rather whether the statutory prerequisites for enforcement of any lien against specific proceeds have been satisfied. In this case, no proceeds were derived from any "judgment, decree or order" in the patent proceedings or from any other judicial or administrative order to pay money where R&G represented the Debtors. The only "proceeds" were from sales of the patents and patent applications, and Section 50 does not encompass those proceeds.

R&G's efforts to equate the sale of patents, licenses and other "economically valuable assets" with achieving a monetary judgment or settlement in a lawsuit or administrative proceeding would, moreover, work an unprecedented and unwarranted expansion of Section 50. At present, a defendant settling a Massachusetts lawsuit knows that it is at risk if it settles with the plaintiff without involving the attorneys who have appeared in the very suit being settled. The universe of interested attorneys is small and immediately identifiable. R&G's theory, in contrast, would create a roving lien putting at risk every purchaser, assignee, mortgagee, and licensee of any "economically valuable asset[]," Appellant's Brief at 17, issued by any municipal, state or federal agency (patents, copyrights, taxi medallions, nursing home licenses, zoning variances, wetlands and other environmental permits, and so on). Indeed, R&G makes clear the impact of its theory when it states that because the Debtor conveyed the patent applications in the Post-Petition Sale "free of R&G's lien," "R&G cannot pursue the buyer, as it could at state law." Appellant's Brief at 26. Because Section 50 contains no time limits, any purchaser or other transferee of such an asset (wherever located) would be forced to determine whether the owner happened to have been represented, even years before, by a "Massachusetts

lawyer" and then to resolve whether that lawyer had been paid.[22]  There is good reason that

Section 50 does not have the effect attributed to it by R&G.  Indeed, it appears that R&G did not

even conceive of this argument until the Debtors sought bankruptcy protection, at which point

R&G first asserted liens with respect to a patents and patent applications which had been sold

four months earlier.  See Appellant's Brief at 3 (R&G has asserted an attorney's lien "[s]ince the

very commencement of the bankruptcy case....").

## III.  R&G's ARGUMENTS UNDER THE BANKRUPTCY CODE IGNORE THE FACT THAT SECTION 50 DOES NOT GRANT LIENS ON THE PROCEEDS OF THE SALES OF PATENTS AND PATENT APPLICATIONS

R&G argues that the Bankruptcy Court violated sections 361, 363 and 364 of the

Bankruptcy Code when it purportedly ruled that R&G's liens as to the patent applications sold in

the Post-Petition Sale "evaporated" or were "extinguished."  Appellant's Brief at 25, 27.[23]

Indeed, R&G claims that the Bankruptcy Court's ruling "contradicts [its] own order authorizing

the Post-Petition Patent Sale," and asserts that the "bankruptcy court order … specifically

provided that liens attach to the proceeds of the sale."  Id. at 2, 27.  R&G claims that it was

entitled to the "indubitable equivalent of [its] interest in" the patent applications.  Id. at 26.

Among other shortcomings, these arguments beg the fundamental question whether R&G had a

secured claim in the first place.

---

[22] During oral argument on this matter, R&G made clear that its claimed "attorneys' lien applies in situations where the lien … is by definition not secret because it only involves court or administrative actual file proceedings." Transcript of 9/21/04 Hearing at 28.  Rephrased in the words of the Court, "a buyer of … a patent in this case, or patent application, would have to check with the Patent Office, find out … what persons represented the applicant in the proceedings and then get some indication from them by way of estoppel letter or whatever evidence that they have been paid or waive[] any lien before they bought…."  Id. at 28.  The adoption of R&G's position would be particularly disruptive because Section 50 sets forth no time limits or perfection requirements, and because R&G's position would apply even to out-of-state applications filed by "Massachusetts lawyers."

[23] The Bankruptcy Court never held that any actual liens "evaporated" or were "extinguished."  To the contrary, the Bankruptcy Court held that the statutory elements which permitted a lien to exist under the Massachusetts Attorney's Lien Statute were never satisfied.  See 315 B.R. at 215.

As set forth above, R&G was not a secured creditor as to the patents or patent applications. Even if it were conceded, for the sake of argument, that Massachusetts law applied, that Section 50 applied to proceedings before the USPTO, and that R&G had a so-called "inchoate lien" when it filed its patent applications (none of which is correct), it is clear that there was not nor would there ever be a USPTO judgment, decree or other order awarding funds to the Debtors on which R&G could assert its lien. And it was equally clear that the funds at issue in this case -- proceeds of the sales of patents and patent applications -- were not derived from a USPTO judgment, decree or other order. The value of R&G's alleged secured claim over those proceeds was nil.

Moreover, the Bankruptcy Court's "Final Order Authorizing Use of Cash Collateral, Granting Replacement Liens and Adequate Protection, and Administrative Expense Priority to CMGI, Inc." made clear that the "existence, validity and perfection" of the "charging lien" claimed by R&G had been "challenged by various parties." The court did not find that such a lien existed or "would attach to the proceeds" of the Post-Petition Sale; it merely stated that R&G was adequately protected "[t]o the extent that such a lien exists." (Bankr. Ct. Docket No. 91, at ¶20). The issue of whether it had such a lien was reserved for another day, and has since been resolved against it.

Similarly, sections 101(5) and 506(a), on which R&G also relies, Appellant's Brief at 27-29, do not excuse R&G from its burden of establishing each of the requisite statutory conditions for a lien under Section 50. R&G may hold a claim, but it holds no lien. It is no different than any other unsecured creditor.

**IV.    NO QUESTIONS SHOULD BE CERTIFIED TO THE SUPREME JUDICIAL COURT**

This Court, rather than the Supreme Judicial Court, should determine which state's law applies to proceedings before a federal agency.  Even if this Court determines that the Massachusetts Attorney's Lien Statute somehow applies, certification of additional questions to the Massachusetts Supreme Judicial Court is not required.  A substantial number of state and federal cases have, without the need for such certification, interpreted Section 50 in a manner which adequately points the way for resolution of the instant case.  The cases make clear that the only proceeds to which an attorney's lien attaches under Section 50 are those derived from a judgment, decree or other order, and even R&G must acknowledge that it fails to satisfy that test. The position taken by R&G would have absurd results, placing a cloud on every municipal, state and federal license where the original filing, whenever it occurred, was (or could have been) made by a member of the Massachusetts bar.[24]  R&G's appeal should be disposed of summarily by this Court without the need for certification, which would only add needless "time and expense to litigation that is already overlong and overly expensive."  B. Selya, "Certified Madness: Ask a Silly Question…," 29 Suffolk U. L. Rev. 677, 691 (1995).

## CONCLUSION

To the extent the Court grants R&G leave to pursue an interlocutory appeal, the October 8 Order should be affirmed.

---

[24] R&G may note that the clearest expressions of the requirements under Section 50 have come from the Massachusetts Appeals Court, rather than the Supreme Judicial Court.  There is no reason to think that the Supreme Judicial Court would embrace the absurd position taken by R&G.  See Losacco v. F.D. Rich Const. Co., 992 F.2d 382, 384 (lst Cir. 1993) ("When the highest state court has not issued a definitive ruling on the precise issue at hand, the federal courts may refer to analogous decisions, considered dicta, scholarly works, or other reliable sources to ascertain how the highest court would rule. … The decisions of intermediate state appellate courts are trustworthy data for ascertaining state law.").

Respectfully submitted,

CRAIG R. JALBERT, LIQUIDATING
SUPERVISOR OF ENGAGE, INC., *et al.*,

By his attorneys,

/s/ Richard W. Benka
Richard W. Benka (BBO #037320)
Andrew Z. Schwartz (BBO #544653)
Euripides D. Dalmanieras (BBO #650985)
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA 02210
Tel.:  (617) 832-1000
Fax:  (617) 832-7000
*bctnotices@foleyhoag.com*

December 21, 2004

**ATTACHMENT A**



**ROPES & GRAY**

About Ropes & Gray
Professional Biographies
Industries/Sectors
Practice Areas
Locations
Career Center
News & Publications
Events
Contact Us

SEARCH
[        ]  GO
Disclaimer

## Intellectual Property & Rights Management: Attorneys

Armistead, Cary
iarmistead@ropesgray.com
617-951-7832

Austin, Christopher J.
caustin@ropesgray.com
415-315-6303

Baughman, J. Steven
sbaughman@ropesgray.com
202-508-4606

Bianco, John V.
jbianco@ropesgray.com
617-951-7973

Black, Edward G.
eblack@ropesgray.com
617-951-7984

Brody, Peter M.
pbrody@ropesgray.com
202-508-4612

Cannella, Emilia F.
ecannella@ropesgray.com
617-951-7170

Carroll, Christopher P.
ccarroll@ropesgray.com
617-951-7756

Chang, Hemmie
hchang@ropesgray.com
617-951-7317

Davis, Geoffrey B.
gdavis@ropesgray.com
617-951-7742

DeGraw, James S.
jdegraw@ropesgray.com
617-951-7539

Fuentes, Gloria M.
gfuentes@ropesgray.com
212-497-3624

Galli, Susan M.
sgalli@ropesgray.com
617-951-7497

Glover, Gregory J.
gglover@ropesgray.com
202-508-4626

Gordon, Edward A.
egordon@ropesgray.com
617-951-7066

Gosz, William G.
wgosz@ropesgray.com
617-951-7617

Granahan, Patricia
pgranahan@ropesgray.com
617-951-7449

Intellectual Property &
Rights Management
Intellectual Property &
Technology Litigation

Attorneys
News & Publications
Need to Know
Events

PRACTICE AREAS

Guo, Z. Angela
aguo@ropesgray.com
617-951-7546

Halstead, David P.
dhalstead@ropesgray.com
617-951-7615

Jamroz, Megan E.
mjamroz@ropesgray.com
617-951-7785

Kaufman, Steven A.
skaufman@ropesgray.com
617-951-7540

Kelly, Edward J.
ekelly@ropesgray.com
617-951-7532

Larsen, Charles
clarsen@ropesgray.com
617-951-7085

Lee, Agnes S.
alee@ropesgray.com
617-951-7794

Li, Weishi
wli@ropesgray.com
617-951-7404

Lu, Yu
ylu@ropesgray.com
617-951-7268

McIntosh, David M.
dmcintosh@ropesgray.com
617-951-7875

Mogilevich, Irina
imogilevich@ropesgray.com
617-951-7021

Moore, Gregory E.
gmoore@ropesgray.com
617-951-7370

Natkanski, Christopher T.
cnatkanski @ropesgray.com
617-951-7175

O'Brien, Patrick
pobrien@ropesgray.com
617-951-7527

Oestreich, Jonathan D.
joestreich@ropesgray.com
212-841-0469

Quisel, John D.
jquisel@ropesgray.com
617-951-7685

Rones, Melissa S.
mrones@ropesgray.com
617-951-7653

Rubenstein, Marc A.
mrubenstein@ropesgray.com
617-951-7826

Schneider, Spencer H.
sschneider@ropesgray.com
212-497-3615

Stutius, Wolfgang
wstutius@ropesgray.com
617-951-7681

Szpak, Mark P.
mszpak@ropesgray.com
617-951-7606

Takeuchi, Erika
etakeuchi@ropesgray.com
212-497-3625

Treannie, Lisa M.
ltreannie@ropesgray.com
617-951-7725

Varma, Anita
avarma@ropesgray.com
617-951-7796

Vincent, Matthew P.
mvincent@ropesgray.com
617-951-7739

---

© 2004 Ropes & Gray LLP. All rights reserved.

**ATTACHMENT B**



**ROPES & GRAY**

About Ropes & Gray
Professional Biographies
Industries/Sectors
Practice Areas
Locations
Career Center
News & Publications
Events
Contact Us

SEARCH
[          ] GO
DISCLAIMER

# Z. Angela Guo



Ropes & Gray
One International Place
Boston, MA 02110-2624
T 617-951-7546
F 617-951-7050
617-854-2085 secretary
aguo@ropesgray.com

RELATED PRACTICES
**Corporate**
Life Sciences
Intellectual Property & Rights Management

**Intellectual Property**

Add to Outlook Contacts

EDUCATION / LANGUAGES / COURTS

Z. Angela Guo is a technology specialist in the Intellectual Property & Technology Practice at Ropes & Gray. She primarily works on patent prosecutions relating to biotechnology. She received a B.S. in Biochemistry (with highest honors) from Nankai University in 1991, and a Ph.D. in Molecular Nutrition from Columbia University in 2000.

Angela concentrated her Ph.D. work on characterizations of genes encoding sterol esterification enzymes. She later completed a postdoctoral fellowship at Harvard Medical School/Brigham & Women's Hospital, where she investigated mechanisms of nitric oxide synthesis in endothelial cells. Angela authored multiple publications and presented her research in many scientific meetings. She was also a recipient of National Research Service Award from National Institutes of Health.

Angela is registered to practice before the U.S. Patent and Trademark Office.

**Education**
2000, Columbia University, Ph.D. (Molecular Nutrition)

1991, Nankai University, B.S. (Biochemistry), *with highest honors*

**Languages**
Chinese

**Courts**
U.S. Patent and Trademark Office

---

© 2004 Ropes & Gray LLP. All rights reserved.

PROFESSIONAL BIOGRAPHIES

# ROPES & GRAY

About Ropes & Gray
Professional Biographies
Industries/Sectors
Practice Areas
Locations
Career Center
News & Publications
Events
Contact Us

SEARCH
[            ] GO
Disclaimer

**Megan E. Jamroz**



Ropes & Gray
One International Place
Boston, MA 02110-2624
T 617-951-7785
F 617-951-7050
617-854-2085 secretary
mjamroz@ropesgray.com

RELATED PRACTICES
**Corporate**
Life Sciences
Intellectual Property & Rights Management

**Intellectual Property**

Add to Outlook Contacts

PROFESSIONAL BIOGRAPHIES

Megan Jamroz comes to Ropes and Gray LLP from the U.S. Patent and Trademark Office where she worked as a Patent Examiner in Art Unit 1644 (Cellular Immunology). She became a member of the patent bar in 2003.

Megan received a B.S. in Biology from the University of Richmond in 1995, and her doctorate in immunology in 1999 from the Medical College of Virginia where she worked with Dr. Dan Conrad in a successful venture to use the native CD23 receptor to develop a new treatment for allergic diseases. She completed a two-year post-doctoral fellowship at the National Institutes of Health where she worked with Dr. Ethan Shevach in the field of autoimmune diseases characterizing T suppressor cells before deciding to pursue a career in intellectual property.

**Education**
1999, Medical College of Virginia, Ph.D. Immunology (Immunology)

1995, University of Richmond, Undergraduate (Biology)

© 2004 Ropes & Gray LLP. All rights reserved.

# ROPES & GRAY

About Ropes & Gray
Professional Biographies
Industries/Sectors
Practice Areas
Locations
Career Center
News & Publications
Events
Contact Us

SEARCH

[ _____ ] GO

Disclaimer

## Yu Lu



Ropes & Gray
One International Place
Boston, MA 02110-2624
T 617-951-7268
F 617-951-7050
617-854-2434 secretary
ylu@ropesgray.com

RELATED PRACTICES
**Corporate**
Life Sciences
Intellectual Property & Rights Management

**Intellectual Property**

Add to Outlook Contacts

EDUCATION / LANGUAGES / COURTS

Yu Lu is a technology specialist and patent agent in the Intellectual Property & Technology Practice at Ropes & Gray. He prosecutes patent applications relating to biotechnology, chemistry, pharmaceuticals, and medical devices.

Yu earned a B.S. in Genetics and Genetic Engineering from Fudan University of Shanghai, China in 1990, ranking first in his class. He received the "Excellent Graduate Award" from the Higher Education Bureau of the Shanghai Municipal Government for outstanding undergraduate achievements. Yu received his Ph.D. in Cell and Developmental Biology in 1999 from the Biological and Biomedical Science Program at Harvard University, where he studied signal transduction pathways of Rho GTPases in the labs of Dr. Jeff Settleman. Prior to his joining Ropes & Gray, Yu was also a Jane Coffin Childs Postdoctoral Fellow in the laboratory of Professor Joan S. Brugge at Department of Cell Biology, Harvard Medical School.

Yu is registered to practice before the U.S. Patent and Trademark Office.

**Education**
Fudan University of Shanghai, B.S.C (Genetics and Genetic Engineering), Highest Disctinction

Oklahoma State University, M.Sc.

Harvard University, Ph.D. (Cell and Developmental Biology)

**Languages**
Chinese

**Courts**
U.S. Patent and Trademark Office

© 2004 Ropes & Gray LLP. All rights reserved.

PROFESSIONAL BIOGRAPHIES

# ROPES & GRAY

About Ropes & Gray
Professional Biographies
Industries/Sectors
Practice Areas
Locations
Career Center
News & Publications
Events
Contact Us

## Melissa S. Rones



Ropes & Gray
One International Place
Boston, MA 02110-2624
T 617-951-7653
F 617-951-7050
617-854-2085 secretary
mrones@ropesgray.com

RELATED PRACTICES
**Corporate**
Life Sciences
Intellectual Property & Rights Management

**Intellectual Property**

Add to Outlook Contacts

SEARCH


Melissa Rones, a technology specialist at Ropes & Gray, concentrates primarily on intellectual property issues pertaining to biology and biotechnology. She earned a B.S. from the Massachusetts Institute of Technology in 1995 and received a Ph.D. in Cell and Developmental Biology from Harvard Medical School in the spring of 2001.

Melissa's graduate work focused on examining signaling events involved during the patterning of tissues to generate complex organs. Her studies defined specific roles for Notch signaling in generating multiple cell types from fields of organ-forming potential during both cardiogenesis and nephrogenesis. Through her research, Melissa is well-versed in the current techniques and literature in many areas, including molecular biology, cellular biology, biochemistry, genetics, developmental biology, neurobiology, immunology, and stem cell biology.

Melissa is the author of numerous publications, and has been invited to present her research on many occasions. She has been the recipient of two NIH pre-doctoral fellowships, and is an active member of the Society for Developmental Biology.

**Education**
2001, Harvard Medical School, Ph.D. (Cell and Developmental Biology)

1995, Massachusetts Institute of Technology, B.S.

**Courts**
U.S. Patent and Trademark Office, 2004

© 2004 Ropes & Gray LLP. All rights reserved.



## Wolfgang Stutius

About Ropes & Gray
Professional Biographies
Industries/Sectors
Practice Areas
Locations
Career Center
News & Publications
Events
Contact Us



Ropes & Gray
One International Place
Boston, MA 02110-2624
T 617-951-7681
F 617-951-7050
617-854-2414 secretary
wstutius@ropesgray.com

RELATED PRACTICES
**Corporate**
Intellectual Property & Rights Management

**Intellectual Property**

Add to Outlook Contacts

SEARCH

[                    ] GO

Disclaimer

Dr. Wolfgang Stutius is a Technology Specialist and Patent Agent at Ropes & Gray, specializing in the preparation of patent applications in physical sciences, electronics, optics, laser and fiberoptic technology, materials science, computer hardware and software, and mechanical design. Wolfgang graduated with a Diplom (M.S.) in Physics from the Eidgenossische Technische Hochschule (ETH) in Zurich, Switzerland. His Diplom thesis related to electrical contact phenomena in crystalline silicon. Wolfgang received his Dr. rer. nat. (Ph.D.) in Physics, also from the ETH Zurich. His doctoral thesis related to the thermal properties of rare-earth magnetic systems at low temperatures. Subsequently, Wolfgang was a postdoctoral fellow in the Physics Department at the University of Wisconsin in Madison, performing research in the areas of superconductivity and magnetism.

In 1972, he joined the Xerox Palo Alto Research Center, conducting fundamental and applied research in the field of magnetic and magneto-optic properties of materials, guided wave optics, gas and semiconductor lasers, and optical spectroscopy, in particular luminescence and fluorescence studies. His team conducted novel Extended X-ray Absorption Fine Structure (EXAFS) measurements on solid electrolytes using the Stanford University SLAC facility. His research further includes x-ray microscopy studies, chemical vapor deposition, in particular the preparation of compound semiconductor films using metalorganic compounds, wide-bandgap semiconductors, and second-harmonic light generation.

In 1984, Wolfgang joined the newly established Polaroid Microelectronics Laboratory in Cambridge, Massachusetts and established a materials section for the preparation of compound semiconductor materials and devices for light-emitting devices (LED's and lasers). This effort led to the first high-power, strained-layer InGaAs/GaAs laser with long lifetime, which have become important for data transmission over optical networks. Polaroid developed several commercial printers based on lasers produced by the group.

Wolfgang has published approximately 50 scientific and technical papers in peer-reviewed journals and presented an equal number of invited and contributed talks at scientific meetings in the United States and abroad. He is a former member of the peer-review boards of the Journal of Applied Physics, Applied Physics Letters, and the Journal of Vacuum Science and Technology. He is also named as an inventor on three patents.

Wolfgang is a member of the Boston Patent Law Association, the Institute of Electrical and Electronics Engineers (IEEE), and the American Translators Association (ATA) and is fluent in German as well as in English. He is registered to practice before the U.S. Patent and Trademark Office.

**Education**
Universities of Gottingen and Gieben, Undergraduate

Ropes & Gray LLP: Biographies: Wolfgang Stutius

© 2004 Ropes & Gray LLP. All rights reserved.

**ATTACHMENT C**

February 2, 1944

Hon. John D. Mackay
Chairman, Committee on the Judiciary,
State House, Boston, Massachusetts.

Dear Senator Mackay:

I transmit a memorandum containing suggestions for additions to whatever bill relative to attorneys' liens the Committee on the Judiciary may consider favorably.

I am personally in favor of the principle of the bills which have been filed relative to attorneys' liens. However, in my capacity as Corporation Counsel representing the City of Boston I felt it advisable to call to the attention of your Committee that the bill posed certain difficulties and problems affecting municipalities. I am informed that Mr. Kerr of this office specifically referred to them at the hearing. It is our belief that the suggestions transmitted herewith overcome the problems which the bill as filed posed.

Mr. Kerr discussed the suggestions transmitted herewith with Mr. George Black, to whom I am sending a copy of this letter.

Respectfully yours,

Corporation Counsel.

FJK/O
Enclosure.

SUGGESTED FOR ADDITION TO WHATEVER BILL RELATIVE TO
LIENS IS REPORTED FAVORABLY

SECTION 3 .  Chapter two hundred and twenty-one of the General
laws is hereby amended by inserting after section fifty, as amended
by section one of this act, the following Sections:  Section 51.
Payment by a city or town to a client in full or in settlement of
any claim, counterclaim, cause of action, judgment, execution,
order, or decree, shall discharge the city or the town all
liability on account of any attorney's liens thereon, unless the
treasurer of the city or town has received written notice from an
attorney having a lien under section fifty that he claims such lien.

SECTION 4 .  Section ninety-three of chapter sixty of the
General Laws, as most recently amended by chapter one hundred and
ninety-nine of the acts of nineteen hundred and forty-three, is
hereby further amended by striking out the last sentence and in-
serting in place thereof the following sentence:-  The collector's
rights under this section shall not be affected by any assignment
or trustee process or attorney's lien.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| ENGAGE, INC., et al.,[1] ) | Case Nos. 03-43655-JBR through |
| ) | 03-43657-JBR, 03-43659-JBR |
| Debtors. ) | 03-43661-JBR and 03-43662-JBR |
| ) | (Jointly Administered) |
| ) | |
| ROPES & GRAY LLP, ) | |
| ) | |
| Appellant, ) | Case No. 04-40225-DPW |
| ) | |
| v. ) | |
| ) | |
| CRAIG R. JALBERT, LIQUIDATING ) | |
| SUPERVISOR OF ENGAGE, INC., ) | |
| ) | |
| Appellee. ) | |

## <u>CERTIFICATE OF SERVICE</u>

I, Elizabeth A. Amoroso, hereby certify that, on this the 21st day of December, 2004, I caused a true and accurate copy of the following:

1.    Brief Of Appellee; and
2.    this Certificate Of Service

to be delivered to

D. Ross Martin, Esq.
Stephen Moeller Sally, Esq.
Ropes and Gray LLP
1 International Place
Boston, MA 02210

---

[1] The Debtors are the following entities: Engage, Inc., MediaBridge Technologies, Inc., AdSmart Corp., Flycast Communications Corp., AdKnowledge, Inc., and Internet Profiles Corp. (together, the "Debtors").

by first class mail, postage prepaid and electronic notice.

/s/ Elizabeth A. Amoroso
Elizabeth A. Amoroso
Paralegal
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA 02210
Tel.:  (617) 832-1000
Dated:  December 21, 2004                    Fax:  (617) 832-7000