UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ENGAGE INC., et al., | ) | Case Nos. 03-43655-JBR *et seq.* |
| Debtors. | ) | Chapter 11 |
| | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| ROPES & GRAY, LLP, | ) | |
| Appellant, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 04-40225-DPW |
| | ) | |
| CRAIG J. JALBERT, | ) | |
| *as Liquidating Supervisor*, | ) | |
| Appellee. | ) | |

<u>MEMORANDUM AND ORDER</u>
September 1, 2005

In the underlying bankruptcy action from which it now
appeals, Appellant Ropes & Gray, LLP ("R&G"), filed a secured
claim against the debtor, Engage, Inc. ("Debtor").  R&G
represented the Debtor in various patent prosecution proceedings
before the United States Patent and Trademark Office ("USPTO").
R&G contended that its claim was secured by virtue of the
Massachusetts attorney's lien statute, Mass. Gen. Laws ch. 221, §
50, which it argued afforded it a lien against the proceeds of
various patents and patent applications sold by the debtor pre-
and post-petition.  The Liquidating Supervisor Craig Jalbert
("Liquidating Supervisor") objected to the secured claim and the

Bankruptcy Court sustained the objection.  R&G appeals the

decision of the Bankruptcy Court and, in conjunction with its

appeal, has moved for the certification of various questions to

the Massachusetts Supreme Judicial Court ("SJC").[1]

---

[1]R&G sought to have the following three questions -- which
it asserted were determinative of the case and for which there
was no controlling precedent in the decisions of the SJC –
certified pursuant to Rule 1:03 of the Rules of the Supreme
Judicial Court:

> 1. When a Massachusetts lawyer is representing a
> Massachusetts client before a federal administrative agency,
> is the existence of an attorney's lien established by
> Massachusetts law or by the law of the state in which the
> federal agency's office happens to be located?

> 2. Does chapter 221, section 50 of the Massachusetts General
> Laws grant a Massachusetts attorney a lien on patents and
> patent applications for patent prosecution work performed on
> behalf of a client?

> 3. As a matter of Massachusetts statutory or common law,
> when a Massachusetts attorney has a lien on a particular
> cause of action or administrative proceeding, and the action
> or administrative rights are sold during the pendency of
> such action or proceeding (e.g., the sale of receivables
> during a collection action or sale of a patent application),
> is the attorney's lien extinguished or does it attach to the
> proceeds of the sale?

As R&G argues, there is no SJC decision squarely holding whether
an attorney's lien attaches to patents and patent applications
pursuant to the Massachusetts attorney's lien statute, Mass. Gen.
Laws ch. 221, § 50, which, based on my choice of law analysis,
governs the resolution of this dispute.  As will appear below, I
find, however, that this issue, and the appeal itself, can be
resolved through application of a well-developed body of case law
from state and federal courts, including the SJC, interpreting
the Massachusetts attorney's lien statute.  See Losacco v. F.D.
Rich Constr. Co., Inc., 992 F.2d 382, 384 (1st Cir. 1993) ("When
the highest state court has not issued a definitive ruling on the
precise issue at hand, the federal courts may refer to analogous
decisions, considered dicta, scholarly works, or other reliable
sources to ascertain how the highest court would rule.  The
decisions of intermediate state appellate courts are trustworthy

The success of R&G's appeal turns on the resolution of two issues: (1) whether the Virginia or the Massachusetts attorney's lien statute govern this dispute; and (2) if the Massachusetts statute governs, whether it grants an attorney representing a client in patent prosecution proceedings before the USPTO a lien on patents and patent applications related to that representation.

For the reasons set forth below, I depart from the Bankruptcy Court to conclude that the attorney's lien statute of Massachusetts, not Virginia, governs this action. I agree, however, with the Bankruptcy Court's alternative holding that no attorney's lien can arise in this case under Massachusetts law because patent prosecution before the USPTO cannot, by definition, yield the "judgment, decree or other order" necessary for a lien under this law to become enforceable. Accordingly, the decision of the Bankruptcy Court denying R&G a secured claim will be affirmed.

## I. BACKGROUND

The findings of the Bankruptcy Court set the context for this dispute.

> On June 19, 2003, Engage, Inc. and five of its wholly-owned domestic subsidiaries (hereinafter the "Debtors") filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* Ropes & Gray (hereinafter "Ropes"), which provided legal services to the

---

data for ascertaining state law.") (internal citations omitted). I will deny, therefore, the motion by R&G for an order certifying questions to the SJC.

Debtors in connection with the prosecution of various patents, was scheduled as a creditor in the Debtors' bankruptcy. Shortly after the petition was filed, substantially all of the Debtors' assets were sold to JDA Software Group, Inc. (hereinafter "JDA"). Ropes alleges it has an attorney's charging lien pursuant to Mass. Gen. Laws, ch. 221, § 50 in "(i) certain patents and patent prosecution actions of the Debtor and (ii) cash proceeds of a prepetition sale of other patents."[FN1] [Text of FN1: This pre-petition sale took place on February 20, 2003, approximately four months prior to the date of Debtors' Chapter 11 petition, and yielded $100,000 in cash proceeds.]

Ropes timely filed a proof of claim asserting an attorney's charging lien in the amount of $108,737.11; $45,198.29 was for unpaid fees and expenses allegedly secured by the proceeds of the JDA Sale, with the remaining $63,538.82 for unpaid fees and expenses allegedly secured by the proceeds of the pre-petition sale. Ropes also asserted a secured claim in the amount of $737.50 for fees and expenses associated with collection costs pursuant to 11 U.S.C. § 506(b) as well as a general unsecured claim in the amount of $51,400.30 on account of licensing work for which Ropes was unpaid.

This Court entered the Order Confirming Debtors' Seconded Amended Plan of Liquidation under Chapter 11 of the Bankruptcy Code on May 20, 2004. Paragraph 13 of this Confirmation Order authorized Craig Jalbert to serve as Liquidating Supervisor. His timely Objection to Ropes' secured claim and the Responses thereto ensued.

In re Engage, Inc., 315 B.R. 208, 210-11 (Bankr. D. Mass. 2004).

A few points of clarification are necessary. First, the pre-petition sale referenced above involved the sale by the Debtor not only of patents but also of patent applications pending in the USPTO. All of these patents and patent applications had been filed and prosecuted by R&G on behalf of the Debtor. Second, with respect to the post-petition sale of the remainder of Debtor's assets, a sale which included various patents and patent applications filed and prosecuted by R&G, the Bankruptcy Court ordered that the patents and patent applications

-4-

be sold free and clear of liens.  The Bankruptcy Court ordered
that a cash reserve be maintained in an amount equal to R&G's
asserted lien, $108,737,11, thereby providing R&G with adequate
protection in the event that the pending litigation over the
existence and validity of the attorney's lien it asserted was
resolved in its favor.

## II. DISCUSSION

**A.    Jurisdiction**

I find this Court has jurisdiction to hear this appeal
pursuant to 28 U.S.C. § 158(a).  Section 28 U.S.C. § 158 (a)
provides:

> The district courts of the United States shall have
> jurisdiction to hear appeals
> (1) from final judgments, orders, and decrees;
> (2) from interlocutory orders and decrees issued under
> section 1121(d) of title 11 increasing or reducing the time
> periods referred to in section 1121 of such title; and
> (3) with leave of the court, from other interlocutory orders
> and decrees;
> and, with leave of the court, from interlocutory orders and
> decrees, of bankruptcy judges entered in cases and
> proceedings referred to the bankruptcy judges under section
> 157 of this title.  An appeal under this subsection shall be
> taken only to the district court for the judicial district
> in which the bankruptcy judge is serving.

Id. (footnote omitted).

R&G maintains that the decision of the Bankruptcy Court from
which it appeals is a final order, appealable as of right under
28 U.S.C. § 158(a)(1).  The Liquidating Supervisor, on the other
hand, contends that order below was interlocutory -- analogous to
the grant of partial summary judgement -- and therefore may not

be appealed as of right but only upon the exercise of the
district court's discretion.  I agree with the Liquidating
Supervisor that the order below did not "conclusively determine"
R&G's claim.  Although the order was a final determination that
R&G's claim was not secured -- and, therefore, not entitled to
priority over unsecured claims -- it did not address and
conclusively resolve the amount of the claim, a matter over which
there is some dispute, despite the gloss R&G puts on the issue.

Had the Bankruptcy Court decided that (1) R&G was entitled
to a specific dollar amount and (2) its claim for those monies
was not secured, there is no question that the decision would
constitute a final order from which an appeal could be taken as
of right.  See In re Morse Elec. Co., Inc., 805 F.2d 262, 264-65
(7th Cir. 1986) (holding that the "disposition of a creditor's
claim in bankruptcy is 'final' for purposes of [28 U.S.C. § 158]"
when the court has "accepted and valued" the claim and determined
the creditor's position (i.e., secured or unsecured), because
such an order "leaves a claimant nothing more than to await the
outcome of third-party litigation") (internal quotations
omitted).

Following the Bankruptcy Court's order sustaining the
Liquidating Supervisor's objection, however, R&G could not simply
sit on the sidelines and await payment on its claim, subject to
proration only based on the amount of assets available for
distribution and the relative priority of the other unsecured

-6-

claims.  R&G still needed to establish the <u>amount</u> of its claim --

in the face of an objection by the Liquidating Supervisor to the

amount originally alleged -- to the satisfaction of the

Bankruptcy Court.

The decision of the Bankruptcy Court sustaining the

objection by the Liquidating Supervisor to R&G's secured claim,

therefore, is not a "final determination" of R&G's claim

appealable as of right.  I will, however, exercise my discretion

under § 158(a)(3) to hear the appeal because the legal issues are

fully framed and their prompt resolution through interlocutory

appeal is likely to contribute to a more expeditious resolution

of the case.

## B. Choice of Law Analysis

In the absence of any effective choice of law by the two

contracting parties -- and apparently without any argument below

by the parties that a conflict of law actually existed -- the

Bankruptcy Court determined that under the applicable

Massachusetts choice of law principles governing contracts, the

attorney's lien law of Virginia, rather than that of

Massachusetts, governed the relevant patent prosecution

representation before the USPTO, whose offices are located in

Alexandria, Virginia.  I review the Bankruptcy Court's decision

regarding the appropriate choice of law de novo, but apply a

clearly erroneous standard in the course of "reviewing the

factual findings that underlie the choice of law determination."

<u>Downing v. Abercrombie & Fitch</u>, 265 F.3d 994, 1005 (9th Cir. 2001).

In reaching the conclusion that the Virginia attorney's lien statute applied to proceedings in the USPTO, the Bankruptcy Court did not directly address the predicate question of which choice of law rules it should apply:  "it's own (the 'federal common law') or those of the state in which it sits." <u>In re Morse Tools, Inc.</u>, 108 B.R. 384, 385 (Bankr. D. Mass. 1989).  Rather, it immediately applied the "'significant contacts' test" that it had determined was "the Massachusetts choice of law governing contracts." <u>Engage</u>, 315 B.R. at 212-13.  This avoided the unsettled question regarding "whether or not a federal court exercising bankruptcy jurisdiction must follow the choice-of-law rules of the state in which it sits or the federal common law choice-of-law rules." <u>In re American Metrocomm Corp.</u>, 274 B.R. 641, 659 n.16 (Bankr. D. Del. 2002); <u>see also</u> <u>Morse Tool</u>, 108 B.R. at 385 & n.1; <u>In re Gaston & Snow</u>, 243 F.3d 599, 605 & N.6, 607 (2d Cir. 2001) (holding that bankruptcy court, in the manner of a federal court sitting in diversity, should apply the choice of law rules of the forum state in which it sat, but "necessarily [limiting this] holding to cases where no significant federal policy, calling for the imposition of a federal conflicts rule, exists").  Because both the federal common law and Massachusetts law follow the "multiple factor, 'interest analysis' or 'most significant relationship' analysis exemplified by the <u>Restatement (Second) of Conflict of Laws (1971))</u>," <u>Morse Tool</u>, 108 B.R. at

-8-

385 (quoting <u>Bi-Rite Enterprises, Inc. v. Bruce Miner Co., Inc.</u>,
757 F.2d 440, at 442-43 (1st Cir. 1985)), however, this
controversy need not be resolved for purposes of the present
action.  <u>See also</u> <u>Bushkin Assoc., Inc. v. Raytheon Co.</u>, 393 Mass.
622, 632-33 (1985) (emphasizing the "choice-influencing factors
listed in § 6(2) of the Restatement (Second) of Conflict of Laws"
in conducting choice of law analysis in contract action); <u>Nile v.
Nile</u>, 432 Mass. 390, 401 (2000) (in resolving breach of contract
issue, "look[ing] to factors such as those enumerated in
Restatement (Second) of Conflicts of Laws").  The choice of law
question, whether as a matter of federal common law or
Massachusetts, is resolved under the "most significant
relationship," test set forth in the Restatement (Second) of
Conflict of Laws § 188(1).

The Restatement sets forth the following examples of
principles relevant to the choice of law analysis:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the
> relative interests of those states in the determination of
> the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of
> law,
> (f) certainty, predictability, and uniformity of result, and
> (g) ease in the determination and application of the law to
> be applied.

Restatement (Second) of Conflict of Laws § 6(2) (1971).  In
circumstances such as those presented here, where the parties to
a contract have failed to make an effective choice of law
themselves, the Restatement states that the "contacts to be taken

-9-

into account in applying the principles of § 6 to determine the

law applicable to an issue include:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."

Id. at § 188(2).  With respect to order of importance, the

Restatement directs that "[t]hese contacts are to be evaluated

according to their relative importance with respect to the

particular issue."   Id.

In determining that Virginia law regarding attorney's liens

applied pursuant to what it termed the "significant contacts"

test called for under Massachusetts choice of law analysis, the

Bankruptcy Court concluded:

> [a]lthough the only contact with Virginia may be that the Patent and Trademark Office is located there, the filing of the patent applications and obtaining of some patents are fundamental to Ropes' assertion of its lien.  But for the patent applications, all of the fees are unsecured. Therefore, while there are more contacts with Massachusetts, the Court finds that the most significant and meaningful one is with Virginia.

Engage, 315 B.R. at 213.[2]  By referring to the applicable test as

---

[2]Before turning to Massachusetts choice of law analysis as an alternative, the Bankruptcy Court made its primary conclusion "[t]hat the law of the jurisdiction where judgment entered [i.e., Virginia] should control seems obvious: but for the judgment there is no right to enforce a charging lien."  Engage, 315 B.R. at 212.  The court reached this conclusion based on "[a] litany of authority suggest[ing] that the determination of what state law should apply to a given proceeding is a qualitative analysis determined by the 'law of the state in which the legal services are to be performed.'"  Id. at 211-12.  With respect to the question of where "the legal services are to be performed" when a law firm in state A represents its client in proceedings in state

"significant contacts," rather than as "significant relationship," the Bankruptcy Court appears to have focused too narrowly on where the most significant contact was found rather than on the state with the most significant relationship to the transaction.

A broader consideration of the relevant § 188(2) contacts leads to the conclusion that Massachusetts is the state with "the most significant relationship to the transaction and the parties under the principles stated in § 6"[3] and its laws will determine "[t]he rights and duties of the parties with respect to an issue in contract." Id. at § 188(1). Without mentioning the § 6

---

B, the court cited with approval a secondary source stating that:

> '[t]he generally accepted rule is that the existence and effect of an attorney's lien arising under such a contact is governed by the law of the place where the contract is to be performed, that is, where the contemplated action or proceeding is to be instituted, and not by the place where the contract was made...'

Id. at 212 (quoting E.H. Schopler, Annotation, Conflict of Laws as to Attorneys' Liens, 59 A.L.R. 2d 564, 1958 WL 11124 (1958) (footnotes omitted)).  At the conclusion of this line of analysis, the court noted that "[a]pplying Massachusetts choice of law for contract actions leads to the same conclusion," Engage, 315 B.R. at 212, and proceeded to re-address the question employing Massachusetts choice of law principles.

[3]As set forth, supra, those principles are: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6(2) (1971).

principles or discussing how they applied, the Bankruptcy Court concluded that the "most significant and meaningful" <u>contact</u> was with Virginia because the patent applications and patents "fundamental to Ropes' assertion of its lien" were filed and obtained at the federal Patent and Trademark Office in Virginia. 315 B.R. at 213.  I find this conclusion to be clearly erroneous.

In defense of the Bankruptcy Court's choice of Virginia law, the Liquidating Supervisor contends that "[n]o reasoned distinction can be drawn between the application of Virginia's lien law to proceedings before the USPTO, on the one hand, and the application of any state's attorney's lien law to a federal cause of action in a federal court sitting in that state."  Brief of Appellee at 16.  I disagree.  The fundamental distinction to be drawn is that the USPTO is a nationwide federal administrative <u>agency</u>, not a court sitting within a particular state. Proceedings in the USPTO are  governed by its own laws, rules, Code of Professional Responsibility, and admissions standards, which allow for attorneys and non-attorneys alike to register to practice before the Office.  Unlike the customary approach of the local rules of United States District Courts, they do not incorporate particular state rules by reference.

The needs of the interstate system, the initial § 6(2) principle, would be compromised, rather than advanced, by finding that Virginia attorney's lien law governs all proceedings in the USPTO.  Such a holding potentially would give nationwide effect, at least within this federal field of practice, to the policy

determination of a single state regarding the tools available for
attorneys to collect fees for work performed.  To the extent that
other states whose attorneys practice in the field of patent law
-- and, consequently, appear before the USPTO -- have attorney's
lien statutes allowing for such liens to attach in patent
prosecution work, a finding that Virginia attorney's lien law
applies to all USPTO proceedings would defeat the related
principle of advancing "relevant policies of other interested
states." § 6(2)(c).  Although this result might tend to enhance
"certainty, predictability, and uniformity of result," another of
the § 6(2) principles, it would only do so if all states accepted
the extrajurisdictional reach of Virginia attorney's lien law
with respect to USPTO proceedings.  See Bushkin, 393 Mass. at 635
(finding § 6(2) uniformity principle not advanced where other
jurisdictions had not accepted analogous "extrajurisdictional
reach").  Courts in two states, Minnesota and New York, have held
that their own attorney's lien law applies to representation of
clients in patent proceedings before the USPTO.  Schroeder,
Siegfried, Ryan & Vidas v. Modern Elec. Products, Inc., 295
N.W.2d 514, 516 (Minn. 1980); Hedman, Gibson & Costigan, P.C. v.
Tri-Tech Sys. Int'l Inc., No. 92 Civ. 2757, 1994 WL 18536, at *1,
*4 (S.D.N.Y. Jan. 14, 1994), modified by 1995 WL 555702 (S.D.N.Y.
Sept. 18, 1995).

     In addition to consideration of the "relevant policies," §
6(2)(c) suggests a balancing test to identify "the relative

interests of [other interested] states in the determination of
the particular issue."  Neither the Bankruptcy Court nor the
appellee explain why Virginia would have an interest in this
"particular issue" in the first place, much less why its interest
should be found paramount.  No Virginia parties or counsel
appeared in the federal administrative proceedings at issue, no
Virginia law was applied, and none of the Virginia's mechanisms
for regulating the legal profession were employed.  In a head-to-
head comparison with Massachusetts, whose attorneys appeared in
the action, it is difficult to see how Virginia law should
prevail.

Section 6(2)(b), the "relevant policies of the forum"
principle, also weighs in favor of applying Massachusetts law in
this instance.[4]  As discussed by the Bankruptcy Court and
conceded by R&G, if Virginia attorney's lien law applies to all
proceedings in the USPTO, it would not be possible for R&G -- or
for an attorney from any other state, for that matter -- to
effect a lien based on representing a client in that forum.[5]  The

--------

[4]I am assuming, for purposes of this analysis, that the
USPTO is the forum.

[5]The Virginia attorney's lien statute, set forth below in
relevant part, only allows for such liens when the attorney
represents a client in a tort action, an action to recover
liquidated or unliquidated damages in contract, or a divorce
action, therefore excluding patent prosecution actions before the
USPTO.

Any person having or claiming a right of action sounding in

-14-

Consolidated Patent Rules applicable to patent prosecution
proceedings in the USPTO indicate that the forum contemplated a
different result. Rule 10.64, titled "Avoiding acquisition of
interest in litigation or proceeding before the Office," provides
that:

> (a) A practitioner shall not acquire a proprietary interest
> in the subject matter of a proceeding before the Office
> which the practitioner is conducting for a client, except
> that the practitioner may:
>> (1) Acquire a lien granted by law to secure the
>> practitioner's fee or expenses; or
>> (2) Contract with a client for a reasonable contingent
>> fee; or
>> (3) In a patent case, take an interest in the patent as
>> part of all of his or her fee.

37 C.F.R. § 10.64 (2005). By carving out an exception for
attorney's liens from the general prohibition against
practitioners "acquiring a proprietary interest" in patent claims

---

> tort, or for liquidated or unliquidated damages on contract
> or for a cause of action for annulment or divorce, may
> contract with any attorney to prosecute the same, and the
> attorney shall have a lien upon the cause of action as
> security for his fees for any services rendered in relation
> to the cause or action or claim. When any such contract is
> made, and written notice of the claim of such lien is given
> to the opposite party, his attorney or agent, any settlement
> or adjustment of the cause of action shall affect the
> existing law in respect to champertous contracts. In causes
> of action for annulment or divorce, an attorney may not
> exercise his claim until the divorce judgment is final and
> all residual disputes regarding marital property are
> concluded. Nothing in this section shall affect the
> existing law in respect to exemptions from creditor process
> under federal or state law.

Va. Code Ann. § 54.1-3932 (2004).

-15-

they prosecute for clients in the USPTO, the USPTO itself clearly indicated a policy choice permitting attorney's liens "granted by law."  A determination that Virginia law regarding such liens governs all proceedings before the USPTO would render this choice a nullity.

The final § 6(2) principle necessary to address specifically, the "protection of justified expectations," is one the SJC has highlighted as a "significant consideration" in the choice of law analysis.  <u>Bushkin</u>, 393 Mass. at 635.  In support of its argument that the Bankruptcy Court's choice of law conclusion should be upheld, the Liquidating Supervisor points to a well-developed body of case law holding that the attorney's lien law of the state in which a lawsuit was brought -- and for cases commenced in federal court under diversity jurisdiction, the law of the state in which the federal court sits -- applies. <u>See, e.g.</u> <u>American Metrocomm</u>, 274 B.R. at 660-62; <u>Great Lakes Transit Corp. v. Marceau</u>, 154 F.2d 623, 626 (2d Cir. 1946); <u>Peresipka v. Elgin, Joliet & Eastern Ry. Co.</u>, 231 F.2d 268, 271-72 (7th Cir. 1956); <u>Lehigh & N.E. R. Co. v. Finnerty</u>, 61 F.2d 289, 290 (3d Cir. 1932); <u>Hoxsey v. Hoffpauir</u>, 180 F.2d 84, 86 (5th Cir. 1950).

But the reasoning underlying these decisions implicates different considerations of intent and expectation.  The bankruptcy court in <u>American Metrocomm</u>, for example, responded to and rejected the argument by the claimant law firm that the

-16-

attorney's lien law of Illinois applied.  Although the client
representation contract was negotiated and executed at the law
firm's office in Illinois and the client's case files were there,
the bankruptcy court found that the attorney's lien law of
California and/or Louisiana, "the places where performance of the
contract was intended, anticipated, and actually took place,"
applied:

> [] Duane Morris cannot argue that it had a justified
> expectation that only Illinois law would control.  As
> members of the legal profession, Duane Morris attorneys
> know, or should know, that they become subject to the
> professional rules of conduct in each state in which they
> appear on behalf of a client.  Two Illinois attorneys
> appeared on behalf of AMC in California, were admitted pro
> hac vice for that purpose, and therefore, agreed to abide by
> California's Rules of Professional Conduct.  One of the
> attorneys representing AMC is a member of the California
> Bar.  Cisco's action against AMC was transferred to
> Louisiana upon motion submitted by these attorneys.  At the
> same time, AMC's action against Cisco was pending in
> Louisiana. Therefore, Duane Morris should have reasonably
> expected that Louisiana and California might govern the
> determination of whether it has a valid lien on the Attorney
> Files.

Id. at 662.  See also Lehigh, 61 F.2d at 290 (holding that "the
employment of an attorney of New Jersey and the bringing of suit
in New Jersey indicate that the parties intended from the first
that suit should be brought in that state.  And being brought
there, the laws of that state control as to the lien."); Hoxsey,
180 F.2d at 86 (finding that "by his employment of counsel and
the institution of suit in the Court in New York the appellant
[client] became subject to the statutes of New York regulating

and controlling the attorney-client relationship with reference
to the fixing and enforcing of the respective rights between the
parties" and "Federal Courts sitting in a State enforce that
State's statutes creating attorney's liens").

By contrast, the USPTO has its own standards of admission
and Code of Professional Responsibility.  Proceedings before the
USPTO are governed by the agency's own rules and regulations.
Attorneys appearing before the USPTO, therefore, would have a
"justified expectation" of being subject to the USPTO rules of
professional conduct.  Absent some other basis -- for example,
being admitted to practice in Virginia, representing a client
from Virginia, specifically agreeing with a client that Virginia
law governed the representation -- an attorney representing a
client before the USPTO would have no rational basis for
supposing that Virginia attorney's lien law governed the
representation.

Furthermore -- and in contrast to an attorney representing a
client in state or federal court proceedings in Virginia -- an
attorney appearing in the USPTO would have received no prior
notice that Virginia law might apply.  While the caselaw is rife
with decisions, as the Liquidating Supervisor points out,
explaining the applicability of the attorney's lien law of the
state in which a suit was brought to those proceedings, it
contains not a single ruling -- other than the one that is the
subject of this appeal -- holding that proceedings in the USPTO

-18-

are governed by Virginia attorney's lien law, or any other aspect of Virginia law for that matter.

Accordingly, pursuant to the "most significant relationship" choice of law analysis applicable under both Massachusetts law and federal common law, I find that the USPTO proceedings at issue were governed by the attorney's lien law of Massachusetts, not Virginia.

## C. Applicability of Massachusetts Lien Statute to Patent Prosecution

To determine whether R&G has a valid lien against the proceeds of the patents and patent applications, it is necessary first to resolve whether the Massachusetts attorney's lien statute, Mass. Gen. Laws ch. 221, § 50, allows for a lien in patent prosecution work at all.  The statute reads:

> From the authorized commencement of an action, counterclaim or other proceeding in any court, or appearance in any proceeding before any state or federal department, board or commission, the attorney who appears for a client in such proceeding shall have a lien for his reasonable fees and expenses upon his client's cause of action, counterclaim or claim, upon the judgment, decree or other order in his client's favor entered or made in such proceeding, and upon the proceeds derived therefrom. Upon request of the client or of the attorney, the court in which the proceeding is pending or, if the proceeding is not pending in a court, the superior court, may determine and enforce the lien; provided, that the provisions of this sentence shall not apply to any case where the method of the determination of attorneys' fees is otherwise expressly provided by statute.

Id.

Prior to the enactment of the current attorney's lien statute in 1945, Massachusetts law provided for an attorney's lien only in limited circumstances:

-19-

> An attorney who is lawfully possessed of an execution, or
> who has prosecuted a suit to final judgment in favor of his
> client, shall have a lien thereon for the amount of his fees
> and disbursements in the cause, but this section shall not
> prevent the payment of the execution or judgment to the
> judgment creditor by a person who has no notice of the lien.

R.L. 1902 ch. 165, § 48 (text available in statutory history

annotation to Mass. Gen. Laws ch. 221, § 50 (West 1993)).

The current attorney's lien law is much broader in scope

than its predecessor, allowing for such liens not only when

attorneys represented their clients in court actions but also

when they appeared for clients "in any proceeding before any

state or federal department, board or commission."  Mass. Gen.

Laws ch. 221, § 50.  The new law also expanded the range of

terminal events upon which a lien could attach from only an

execution or "final judgment" in favor of the client, to include

a "judgment, decree or other order in his client's favor."  Id.

Thus, for example, if an attorney represented his client in

proceedings before the Massachusetts State Board of Retirement

and obtained a favorable decision awarding his client a lump sum

payment, the attorney would have an attachment on that award

pursuant to the attorney's lien statute for his reasonable fees

and expenses related to representing his client in those

proceedings.

The Bankruptcy Court agreed that the Massachusetts

attorney's lien statute applies to administrative agency

proceedings, citing both the "before any state or federal

-20-

department, board or commission" language in the statute, as well
as an unpublished Appeals Court of Massachusetts decision finding
that an attorney asserting a lien could satisfy the first of four
requisite elements for an attorney's lien by appearing and
rendering representation in an administrative agency.  Engage,
315 B.R. at 213-14 (citing Gormley v. Wilkins, No. 00-P-1490,
2002 WL 31204473 at ***2 (Mass. App. Ct. Oct. 3, 2002)).

    The Bankruptcy Court went on to list the "three additional
requirements [that] must also be met" for an attorney to be
entitled to such a lien: (1) the attorney's fees must be
reasonable; (2) a judgment, decree or order must have entered in
connection with the attorney's representation of the client; and
(3) the judgment, decree or order must be in the client's favor.
Engage, 315 B.R. at 214 (citing Gormley, 2002 WL 31204473 at
***2).  It was on the second of these grounds that R&G's argument
faltered, the Bankruptcy Court concluded.  The court found that:

> the Massachusetts attorney's charging lien statute and the
> courts interpreting it have clearly stated that an
> attorney's lien can only exist and become choate when all of
> the elements are met.  Ropes' inchoate lien would thus only
> mature and become choate if the patents, patent applications
> and the proceeds deriving therefrom rightly constitute a
> "judgment, decree or other order" pursuant to M.G.L. c. 221
> § 50.  They do not.

Id. at 215.

    In explaining why it remained unconvinced that patent
prosecution work "falls within the purview of the unambiguous
terms of the statute," id. at 214, the Bankruptcy Court stated
that:

A patent does not order anyone to do anything or pay any
money.  Even if a patent could be deemed an order, however,
the proceeds derived from its sale do not stem from the
actual order of the Patent Office, but rather from the sale
of the underlying intellectual property protected by the
patent.  Since allowance of the applications did not itself
require or trigger the payment of any money and no judgment,
decree or other order entered in connection with Ropes'
representation, it thus follows that no charging lien
attached.

Id.

The Court concluded that "if Massachusetts law applies to this

dispute,. . . Ropes has nothing more than an inchoate lien in the

proceeds of its patents, applications and patent prosecution

actions."  Id. at 217.

　　Following de novo review of this issue, I conclude that R&G

does not have even an inchoate lien on the "proceeds of [the]

patents, applications and patent prosecution actions" pursuant to

Mass. Gen. Laws ch. 221, § 50, because patent prosecution actions

in the USPTO, by definition, cannot yield the sort of "judgment,

decree or order" required for such a lien to be perfected.

　　The Massachusetts Supreme Judicial Court has clearly

explained what sort of lien the Massachusetts statute allows.

"[T]he type of lien created by G.L. c. 221, s 50, is a charging

lien which binds the judgment or money decree for payment of

expenses incurred and for services rendered by an attorney with

respect to the particular action or suit."  Torphy v. Reder, 357

Mass. 153, 156 (1970).  In Torphy, an attorney petitioned to

establish and enforce an attorney's lien under Mass. Gen. Laws

ch. 221, § 50, against certain of his client's stock certificates

-22-

and bankbooks, which had been placed in escrow in a safety deposit box in the course of the underlying lawsuit and were removable only with the signature of counsel for both parties in that action. Id. at 153-55. The court in the underlying action determined that one-half of the property at issue, including the stock certificates and bankbooks placed in escrow, belonged to the client's wife, who had commenced the lawsuit.

Responding to his former attorney's petition for a lien on the escrowed property, the client argued that "since there was no decree in his favor there was nothing to which the statutory lien could attach." Id. at 155-56. The SJC agreed, and determined that the petitioning attorney "sought to assert, if anything, a possessory or retaining lien," as distinguished from the charging lien provided for by the statute. Id. at 156. The Court declined to resolve the open question of "[w]hether in this Commonwealth an attorney has a lien for his fees on the moneys, papers, books or other property of his client which come in to his possession," finding that no necessary lien could be claimed where, as in this case, the attorney held his client's property in conjunction with another and pursuant to a voluntarily assumed fiduciary duty as escrow agent. Id.

In the teeth of this determination by the SJC that the charging lien available under Mass. Gen. Laws ch. 221, § 50, depends upon a "judgment or money decree" being entered in favor of the client in the "particular action or suit" for which the

-23-

attorney seeks compensation, R&G argues that the statute imposes no requirement for a "judgment, decree or other order" in order for such a lien to attach.  To support this contention, the sole Massachusetts decision R&G relies on is <u>Webber v. Napolitano</u>, 320 Mass. 765 (1947), an SJC rescript opinion R&G contends "directly supports the conclusion that the attorney's lien applies to patent prosecution work."  I disagree.

In <u>Webber</u>, an attorney brought suit in equity to recover $250 from his former client allegedly due as fees for legal services provided in obtaining a lodging house license for the client from the City of Boston Licensing Board.  <u>Id.</u> at 766.  The defendant-client filed a counterclaim alleging that the attorney "unreasonably, maliciously and without right retained possession of the lodging house keeper's license" issued in the name of the client for twenty days, despite the client's repeated demands that he release it, and thereby deprived the client of "earning any income from said lodging house" during that time period.  <u>Id.</u> at 765.  In response to the counterclaim, the attorney admitted that he had retained the license issued in his client's name but that he "did so legally as he had an attorney's lien on the said license as provided by [the Massachusetts attorney's lien statute]."  <u>Id.</u>

The trial court entered judgment for the attorney on his claim, ordered the client to pay the attorney $250 -- which it found was "fair and reasonable compensation" for the services

-24-

rendered -- plus interest thereon, and dismissed the client's counterclaim. <u>Id.</u> The report of material facts by the trial court supporting its decision included the following findings:

> 'the plaintiff received from the licensing board a lodging house license which he obtained from the licensing commission for the benefit of his client the defendant, but I do not find that he retained said license unreasonably, maliciously and without right.'

<u>Id.</u> The defendant appealed the decision, contending that his counterclaim based on the attorney's retention of the license for twenty days was dismissed in error.

In affirming the decision of the trial court, the SJC held that:

> The decree is supported by the findings of material facts. These facts are not mutually inconsistent, nor are they plainly wrong or incompatible with the pleadings. They are not incompatible with the admission by the plaintiff of 'the alleged demands' by the defendant for the license or with the plaintiff's admission that he re[]tained possession of the license and refused to turn it over to the defendant. The admitted facts, which did not include the terms of the employment of the plaintiff by the defendant or the period of retention of the license by the plaintiff, did not require a finding that the plaintiff retained the license 'unreasonably, maliciously and without right.' This is true whether or not the plaintiff had any right under [the Massachusetts attorney's lien statute].

<u>Id.</u> at 765-66 (internal citation omitted). Based on this text, R&G argues that "[i]n <u>Webber</u>, the Supreme Judicial Court recognized that an attorney is entitled to a lien on economically valuable assets that are created by virtue of that attorney's services. Indeed, the Court acknowledged the existence of the lien both under the Massachusetts Attorney's Lien Statute and as

a matter of general equitable principles." Brief of Appellants
at 16-17. That is, at best, a hopeful reading of the decision.

The ruling in <u>Webber</u> makes only glancing reference to the
Massachusetts attorney's lien statute and then only to observe
the statute was immaterial to the outcome.[6] This reference
simply cannot support R&G's contention that the attorney's lien
provided for by Mass. Gen. Laws ch. 221, § 50, extends to any
"economically valuable assets [] created by virtue of that
attorney's services." <u>Webber</u> cannot be read as a specific,
affirmative finding by the court that the attorney had a lien on
the license pursuant to the attorney's lien law. In concluding
that a different result was not compelled by law, the SJC noted -
- for purposes of completeness, presumably -- that the attorney's
defense to the counterclaim did not depend on the rights he had,
if any, to a lien on the license under that law.

Even if its interpretation of <u>Webber</u> as extending the
Massachusetts attorney's lien law to "economically valuable
assets that are created by virtue of that attorney's services"
were accepted, R&G would bear a further burden. The patents and
patent applications on which it asserts liens have since been
sold. For R&G to prevail, therefore, requires another
interpretive leap, a finding that the phrase "the proceeds
derived therefrom" in the Massachusetts attorney's lien statute

---

[6]The Court reached its decision "whether or not the
plaintiff had any right under [the Massachusetts attorney's lien
statute]." <u>Webber</u>, 320 Mass. at 766.

has dual antecedents and thereby modifies both "judgment, decree
and other order in his client's favor" (the phrase immediately
preceding it) and also "[the] client's cause of action,
counterclaim, or claim."  Such an interpretative undertaking is
supported neither by precedent nor by logic.

The Bankruptcy Court rejected both this proposed
interpretation and also the invitation by R&G to repudiate what
it characterizes as "passing dictum" in a prior Bankruptcy Court
decision finding that the phrase "the proceeds derived therefrom"
in Mass. Gen. Law ch. 221, § 50, "modifies the prior phrase,
'upon the judgment, decree or other order . . .' only."  In re
Leading Edge Products, Inc., 121 B.R. 128, 131 (Bankr. D. Mass.
1990), aff'd Civ. A. No. 90-13112-Z, 1991 WL 97459, at *1 (D.
Mass. May 28, 1991).  In Leading Edge, a law firm asserted that
it possessed an attorney's lien under Mass. Gen. Laws ch. 221, §
50, on the post-petition settlement of a breach of contract
action it had commenced on behalf of the debtors pre-petition.
The settlement entailed the mutual release of claims between the
parties, "[t]here was no cash exchanged in the context of the
settlement, and the litigation was voluntarily dismissed without
judgment entering in favor of either party."  Leading Edge, 121
B.R. at 129.  As R&G does in the present action, the claimant
attorneys in Leading Edge argued that the words "the proceeds
derived therefrom" in the attorney's lien statute modified "cause
of action, counterclaim or claim," not just "judgment, decree or
other order."  Id. at 130.  The court did not accept this

reading, reasoning that:

> It seems likely to the Court that the drafters of section 50 contemplated the existence of a fund, either made up of cash or capable of being reduced to cash, generated from a judgment, decree or other order, including an order approving a settlement.  The benefit derived from the elimination of [the opposing party's claim against the Debtor in the breach of contract case] did not bring anything into the estate per se--it merely reduced the amount of money that had to be paid out of the Debtors' estate. The Court finds that this is not equivalent to "proceeds."

Id. at 131.  In affirming the Bankruptcy Court's decision in

Leading Edge, the district court held that:

> [] Leading Edge received no cash or cash equivalent as the result of the settlement. Rather, the benefit derived from the elimination of [the opposing party's] claim was merely the elimination of Leading Edge's debt to this creditor . . .. No case in Massachusetts recognizes such a benefit as attachable proceeds under the charging lien statute; all of the relevant cases apply the statute only to a cash fund. Indeed, the use in § 50 of the word "proceeds" (as opposed to a broader term, such as "benefits") indicates that the section's drafters contemplated such a fund.

Leading Edge, 1991 WL 97459, at *1.[7]

The reasoning employed by both courts in Leading Edge

regarding the use of the word "proceeds" in the Massachusetts

attorney's lien statute is fully consistent with the later

---

[7]The open question identified in the decision of the district court regarding whether an attorney's lien may attach pursuant to Mass. Gen. Laws ch. 221, § 50, to a pre-judgment settlement has since been answered, at least with respect to settlements that entail the filing of a stipulation of dismissal with prejudice pursuant to Mass. R. Civ. Pro. Rule 58.  See, e.g., Craft v. Kane, 51 Mass. App. Ct. 648, 653 (Mass. App. Ct. 2001) (holding that "[b]ecause G.L. c. 221, § 50 expressly refers to judgments 'entered or made,' the stipulation of dismissal constituted a judgment within the meaning of the attorney's lien statute"); Phalon v. Technical Communications Corp., No. 9802553, 1999 WL 1326754, at *1, *3 (Mass. Super. Feb. 26, 1999).

decision by the Massachusetts Appeals Court in <u>Cohen v. Lindsey</u>,
38 Mass. App. Ct. 1, 4 (1995), where the attorney client
prevailed.  In <u>Cohen</u>, an attorney representing a landlord in an
eviction action obtained a court-ordered injunction requiring the
defendant-tenant to pay funds into an escrow account pending
final resolution of the action.  The attorney asserted a lien
against the funds under Mass. Gen. Laws ch. 221, § 50.  A
creditor of the attorney's client challenged the asserted lien
and the Superior Court denied the attorney the relief sought.

    The Appeals Court reversed the lower court, finding that the
attorney did have a lien on the court-ordered escrow account.

> [T]he judge ordered [the tenant] to pay $10,000 per month
> into the fund for the use and occupancy of the [subject
> property], subject to a final determination of each party's
> rights and liabilities.  The order established the fund as
> potential security for [the landlord], pending an entry of
> final judgment in the case.  The effect of the order was the
> same as an equitable attachment to reach and apply credits
> of [the tenant] to satisfy [the landlord's] claim.  That the
> order actually required a transfer of funds in favor of [the
> attorney's] client differentiates the order from a simple
> attachment, which might not be the occasion of giving ground
> for an attorney's lien. . . .  When, as occurred in this
> case, [the attorney's] efforts resulted in a fund available
> to satisfy [the client's] liability to the [challenging
> creditor], we may conclude from the language of the first
> sentence of G.L. c. 221, § 50, that the use of the fund for
> the payment of legal fees was appropriate.

<u>Id.</u> at 4-5 (internal citations omitted).

    I concur in interpretation of the phrase "the proceeds
derived therefrom" in Mass. Gen. Laws ch. 221, § 50, to modify
only "the judgment, decree or other order in his client's favor."
Indeed, finding otherwise would impermissibly expand the scope
the attorney's lien statute beyond its plain terms.  To be sure,

-29-

the drafters of the Massachusetts attorney's lien statute could have provided for an attorney's lien that attached not only to proceeds deriving from a "judgment, decree or other order in [the] client's favor" but also to the client's property. But the drafters chose not to do so.

One of the two cases relied upon by R&G that address whether an attorney's lien can attach to a patent, Schroder, 295 N.W.2d 514, involves just such an expansive statute. The Minnesota attorney's lien law at issue there provided that:

> An attorney has a lien for compensation whether the agreement for compensation is expressed or implied (1) upon the cause of action from the time of the service of the summons in the action, or the commencement of the proceeding, and (2) upon the interest of the attorney's client in any money or property involved in or affected by any action or proceeding in which the attorney may have been employed, from the commencement of the action or proceeding, and, as against third parties, from the time of filing the notice of the lien claim, as provided in this section.

Minn. Stat. Ann. § 481.13(a) (2005). The decision by the Schroder court that the plaintiff law firm did have an attorney's charging lien on a patent "obtained in part because of [the law firm's] work on the application for the patent," Schroder, 295 N.W.2d at 515, is thus readily distinguishable.

As the Bankruptcy Court in this action noted, "[t]he language encompassed in the Minnesota statute is significantly broader than that contained in the Massachusetts statute." Engage, 315 B.R. at 215. Under Minnesota law, the reach of an attorney's lien extends to "the interest of the attorney's client in any money or property involved in or affected by any action or

proceeding in which the attorney may have been employed."  Minn.
Stat. Ann. § 481.13 (2005) (emphasis supplied).  If that law were
applicable to this action, it would vest R&G with an attorney's
lien on the proceeds of the sale of Debtor's patents and patent
applications, as those funds constitute "money . . . affected by
[an] action or proceeding" in which R&G was employed, i.e., the
patent prosecution proceedings before the USPTO.  Under the more
restrictive Massachusetts attorney's lien statute, however, a
different result must obtain.

     As a final matter, I note the effort by R&G to conflate the
word "claim" in the text of the Massachusetts attorney's lien
statute with the patent "claims" granted to the Debtor by the
USPTO.  As the Liquidating Supervisor points out and the
Bankruptcy Court suggested, the proceeds that R&G seeks to attach
stem from the underlying intellectual property of the Debtor, not
from the "claim" it made before the USPTO for a patent protecting
that property.  "Claim" is a term of art in patent law,
constituting a "formal statement describing the novel features of
an invention and defining the scope of the patent's protection."
Black's Law Dictionary 241 (7th ed. 1999).[8]  Absent some

---

     [8]It is this term of art definition that distinguishes
Hedman, Gibson & Costigan, P.C.v. Tri-Tech Sys. Int'l Inc., 1994
WL 18536 (S.D.N.Y. 1994), the other case R&G relies upon for the
proposition that a patent prosecution can give rise to an
attorney's lien.  The New York statute at issue in Hedman
recognizes attorney's liens in a broad range of events
capaciously stated:  "verdict, report, determination, decision,
judgment."  N.Y. Judiciary Law § 475 (McKinney 1983).  This
language can be read to encompass the determination or decision
to grant a patent for a claim.

principled basis or justification for substituting this specialized meaning of "claim" in patent law for the general ones applicable to the litigation context,[9] I am not free to subject the attorney's lien statute to such a tortured interpretation. Cf. United Housing Foundation v. Forman, 421 U.S. 837, 848-851 (1975) (holding that housing transaction evidenced by shares called "stock" did not by that choice of nomenclature fall within securities law definition of "stock").

I conclude, therefore, that no attorney's lien under Mass. Gen. Laws ch. 221, § 50, attached in favor of R&G to the patents, patent applications, or proceeds from the sale of the same, based on R&G's representation of the Debtor in patent prosecution proceedings before the USPTO.

### III. CONCLUSION

For the reasons set forth more fully above, I affirm the determination of the Bankruptcy Court that the claim by R&G for attorney's fees owed by the debtor is unsecured.

/s/ Douglas P. Woodlock

_____

DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[9]For example, "the assertion of an existing right;" "a demand for money or property to which one asserts a right;" "an interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing," id. at 240.