UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


In re:                              )
                                    )
ENGAGE INC., et al.,                )    Case Nos. 03-43655-JBR *et seq.*
     Debtors.                       )    Chapter 11
                                    )
_____     )
                                    )
ROPES & GRAY, LLP,                  )
     Appellant,                     )
                                    )    CIVIL ACTION NO.
          v.                        )    04-40225-DPW
                                    )
CRAIG J. JALBERT,                   )
*as Liquidating Supervisor*,        )
     Appellee.                      )


MEMORANDUM AND ORDER
September 1, 2005

In the underlying bankruptcy action from which it now
appeals, Appellant Ropes & Gray, LLP ("R&G"), filed a secured
claim against the debtor, Engage, Inc. ("Debtor"). R&G
represented the Debtor in various patent prosecution proceedings
before the United States Patent and Trademark Office ("USPTO").
R&G contended that its claim was secured by virtue of the
Massachusetts attorney's lien statute, Mass. Gen. Laws ch. 221, §
50, which it argued afforded it a lien against the proceeds of
various patents and patent applications sold by the debtor pre-
and post-petition. The Liquidating Supervisor Craig Jalbert
("Liquidating Supervisor") objected to the secured claim and the

-1-

Bankruptcy Court sustained the objection.  R&G appeals the

decision of the Bankruptcy Court and, in conjunction with its

appeal, has moved for the certification of various questions to

the Massachusetts Supreme Judicial Court ("SJC").[1]

---

[1]R&G sought to have the following three questions -- which
it asserted were determinative of the case and for which there
was no controlling precedent in the decisions of the SJC –
certified pursuant to Rule 1:03 of the Rules of the Supreme
Judicial Court:

> 1. When a Massachusetts lawyer is representing a
> Massachusetts client before a federal administrative agency,
> is the existence of an attorney's lien established by
> Massachusetts law or by the law of the state in which the
> federal agency's office happens to be located?

> 2. Does chapter 221, section 50 of the Massachusetts General
> Laws grant a Massachusetts attorney a lien on patents and
> patent applications for patent prosecution work performed on
> behalf of a client?

> 3. As a matter of Massachusetts statutory or common law,
> when a Massachusetts attorney has a lien on a particular
> cause of action or administrative proceeding, and the action
> or administrative rights are sold during the pendency of
> such action or proceeding (e.g., the sale of receivables
> during a collection action or sale of a patent application),
> is the attorney's lien extinguished or does it attach to the
> proceeds of the sale?

As R&G argues, there is no SJC decision squarely holding whether
an attorney's lien attaches to patents and patent applications
pursuant to the Massachusetts attorney's lien statute, Mass. Gen.
Laws ch. 221, § 50, which, based on my choice of law analysis,
governs the resolution of this dispute.  As will appear below, I
find, however, that this issue, and the appeal itself, can be
resolved through application of a well-developed body of case law
from state and federal courts, including the SJC, interpreting
the Massachusetts attorney's lien statute.  See Losacco v. F.D.
Rich Constr. Co., Inc., 992 F.2d 382, 384 (1st Cir. 1993) ("When
the highest state court has not issued a definitive ruling on the
precise issue at hand, the federal courts may refer to analogous
decisions, considered dicta, scholarly works, or other reliable
sources to ascertain how the highest court would rule.  The
decisions of intermediate state appellate courts are trustworthy

The success of R&G's appeal turns on the resolution of two issues: (1) whether the Virginia or the Massachusetts attorney's lien statute govern this dispute; and (2) if the Massachusetts statute governs, whether it grants an attorney representing a client in patent prosecution proceedings before the USPTO a lien on patents and patent applications related to that representation.

For the reasons set forth below, I depart from the Bankruptcy Court to conclude that the attorney's lien statute of Massachusetts, not Virginia, governs this action. I agree, however, with the Bankruptcy Court's alternative holding that no attorney's lien can arise in this case under Massachusetts law because patent prosecution before the USPTO cannot, by definition, yield the "judgment, decree or other order" necessary for a lien under this law to become enforceable. Accordingly, the decision of the Bankruptcy Court denying R&G a secured claim will be affirmed.

## I. BACKGROUND

The findings of the Bankruptcy Court set the context for this dispute.

> On June 19, 2003, Engage, Inc. and five of its wholly-owned domestic subsidiaries (hereinafter the "Debtors") filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* Ropes & Gray (hereinafter "Ropes"), which provided legal services to the

---

data for ascertaining state law.") (internal citations omitted). I will deny, therefore, the motion by R&G for an order certifying questions to the SJC.

Debtors in connection with the prosecution of various
patents, was scheduled as a creditor in the Debtors'
bankruptcy. Shortly after the petition was filed,
substantially all of the Debtors' assets were sold to JDA
Software Group, Inc. (hereinafter "JDA"). Ropes alleges it
has an attorney's charging lien pursuant to Mass. Gen. Laws,
ch. 221, § 50 in "(i) certain patents and patent prosecution
actions of the Debtor and (ii) cash proceeds of a
prepetition sale of other patents."[FN1] [Text of FN1: This
pre-petition sale took place on February 20, 2003,
approximately four months prior to the date of Debtors'
Chapter 11 petition, and yielded $100,000 in cash proceeds.]

Ropes timely filed a proof of claim asserting an attorney's
charging lien in the amount of $108,737.11; $45,198.29 was
for unpaid fees and expenses allegedly secured by the
proceeds of the JDA Sale, with the remaining $63,538.82 for
unpaid fees and expenses allegedly secured by the proceeds
of the pre-petition sale. Ropes also asserted a secured
claim in the amount of $737.50 for fees and expenses
associated with collection costs pursuant to 11 U.S.C. §
506(b) as well as a general unsecured claim in the amount of
$51,400.30 on account of licensing work for which Ropes was
unpaid.

This Court entered the Order Confirming Debtors' Seconded
Amended Plan of Liquidation under Chapter 11 of the
Bankruptcy Code on May 20, 2004. Paragraph 13 of this
Confirmation Order authorized Craig Jalbert to serve as
Liquidating Supervisor. His timely Objection to Ropes'
secured claim and the Responses thereto ensued.

In re Engage, Inc., 315 B.R. 208, 210-11 (Bankr. D. Mass. 2004).

A few points of clarification are necessary.  First, the
pre-petition sale referenced above involved the sale by the
Debtor not only of patents but also of patent applications
pending in the USPTO.  All of these patents and patent
applications had been filed and prosecuted by R&G on behalf of
the Debtor.  Second, with respect to the post-petition sale of
the remainder of Debtor's assets, a sale which included various
patents and patent applications filed and prosecuted by R&G, the
Bankruptcy Court ordered that the patents and patent applications

-4-

be sold free and clear of liens.   The Bankruptcy Court ordered

that a cash reserve be maintained in an amount equal to R&G's

asserted lien, $108,737,11, thereby providing R&G with adequate

protection in the event that the pending litigation over the

existence and validity of the attorney's lien it asserted was

resolved in its favor.

## II. DISCUSSION

### A.   Jurisdiction

I find this Court has jurisdiction to hear this appeal

pursuant to 28 U.S.C. § 158(a).  Section 28 U.S.C. § 158 (a)

provides:

> The district courts of the United States shall have
> jurisdiction to hear appeals
> (1) from final judgments, orders, and decrees;
> (2) from interlocutory orders and decrees issued under
> section 1121(d) of title 11 increasing or reducing the time
> periods referred to in section 1121 of such title; and
> (3) with leave of the court, from other interlocutory orders
> and decrees;
> and, with leave of the court, from interlocutory orders and
> decrees, of bankruptcy judges entered in cases and
> proceedings referred to the bankruptcy judges under section
> 157 of this title.  An appeal under this subsection shall be
> taken only to the district court for the judicial district
> in which the bankruptcy judge is serving.

Id. (footnote omitted).

R&G maintains that the decision of the Bankruptcy Court from

which it appeals is a final order, appealable as of right under

28 U.S.C. § 158(a)(1).  The Liquidating Supervisor, on the other

hand, contends that order below was interlocutory -- analogous to

the grant of partial summary judgement -- and therefore may not

be appealed as of right but only upon the exercise of the
district court's discretion.  I agree with the Liquidating
Supervisor that the order below did not "conclusively determine"
R&G's claim.  Although the order was a final determination that
R&G's claim was not secured -- and, therefore, not entitled to
priority over unsecured claims -- it did not address and
conclusively resolve the amount of the claim, a matter over which
there is some dispute, despite the gloss R&G puts on the issue.

Had the Bankruptcy Court decided that (1) R&G was entitled
to a specific dollar amount and (2) its claim for those monies
was not secured, there is no question that the decision would
constitute a final order from which an appeal could be taken as
of right.  See In re Morse Elec. Co., Inc., 805 F.2d 262, 264-65
(7th Cir. 1986) (holding that the "disposition of a creditor's
claim in bankruptcy is 'final' for purposes of [28 U.S.C. § 158]"
when the court has "accepted and valued" the claim and determined
the creditor's position (i.e., secured or unsecured), because
such an order "leaves a claimant nothing more than to await the
outcome of third-party litigation") (internal quotations
omitted).

Following the Bankruptcy Court's order sustaining the
Liquidating Supervisor's objection, however, R&G could not simply
sit on the sidelines and await payment on its claim, subject to
proration only based on the amount of assets available for
distribution and the relative priority of the other unsecured

-6-

claims.  R&G still needed to establish the <u>amount</u> of its claim --
in the face of an objection by the Liquidating Supervisor to the
amount originally alleged -- to the satisfaction of the
Bankruptcy Court.

The decision of the Bankruptcy Court sustaining the
objection by the Liquidating Supervisor to R&G's secured claim,
therefore, is not a "final determination" of R&G's claim
appealable as of right.  I will, however, exercise my discretion
under § 158(a)(3) to hear the appeal because the legal issues are
fully framed and their prompt resolution through interlocutory
appeal is likely to contribute to a more expeditious resolution
of the case.

**B. Choice of Law Analysis**

In the absence of any effective choice of law by the two
contracting parties -- and apparently without any argument below
by the parties that a conflict of law actually existed -- the
Bankruptcy Court determined that under the applicable
Massachusetts choice of law principles governing contracts, the
attorney's lien law of Virginia, rather than that of
Massachusetts, governed the relevant patent prosecution
representation before the USPTO, whose offices are located in
Alexandria, Virginia.  I review the Bankruptcy Court's decision
regarding the appropriate choice of law de novo, but apply a
clearly erroneous standard in the course of "reviewing the
factual findings that underlie the choice of law determination."

-7-

_Downing v. Abercrombie & Fitch_, 265 F.3d 994, 1005 (9th Cir.
2001).

In reaching the conclusion that the Virginia attorney's lien
statute applied to proceedings in the USPTO, the Bankruptcy Court
did not directly address the predicate question of which choice
of law rules it should apply:  "it's own (the 'federal common
law') or those of the state in which it sits."  _In re Morse
Tools, Inc._, 108 B.R. 384, 385 (Bankr. D. Mass. 1989).  Rather,
it immediately applied the "'significant contacts' test" that it
had determined was "the Massachusetts choice of law governing
contracts."  _Engage_, 315 B.R. at 212-13.  This avoided the
unsettled question regarding "whether or not a federal court
exercising bankruptcy jurisdiction must follow the choice-of-law
rules of the state in which it sits or the federal common law
choice-of-law rules."  _In re American Metrocomm Corp._, 274 B.R.
641, 659 n.16 (Bankr. D. Del. 2002); _see also_ _Morse Tool_, 108
B.R. at 385 & n.1; _In re Gaston & Snow_, 243 F.3d 599, 605 & N.6,
607 (2d Cir. 2001) (holding that bankruptcy court, in the manner
of a federal court sitting in diversity, should apply the choice
of law rules of the forum state in which it sat, but "necessarily
[limiting this] holding to cases where no significant federal
policy, calling for the imposition of a federal conflicts rule,
exists").  Because both the federal common law and Massachusetts
law follow the "multiple factor, 'interest analysis' or 'most
significant relationship' analysis exemplified by the _Restatement
(Second) of Conflict of Laws (1971))_," _Morse Tool_, 108 B.R. at

-8-

385 (quoting Bi-Rite Enterprises, Inc. v. Bruce Miner Co., Inc.,
757 F.2d 440, at 442-43 (1st Cir. 1985)), however, this
controversy need not be resolved for purposes of the present
action.  See also Bushkin Assoc., Inc. v. Raytheon Co., 393 Mass.
622, 632-33 (1985) (emphasizing the "choice-influencing factors
listed in § 6(2) of the Restatement (Second) of Conflict of Laws"
in conducting choice of law analysis in contract action); Nile v.
Nile, 432 Mass. 390, 401 (2000) (in resolving breach of contract
issue, "look[ing] to factors such as those enumerated in
Restatement (Second) of Conflicts of Laws").  The choice of law
question, whether as a matter of federal common law or
Massachusetts, is resolved under the "most significant
relationship," test set forth in the Restatement (Second) of
Conflict of Laws § 188(1).

     The Restatement sets forth the following examples of
principles relevant to the choice of law analysis:

     (a) the needs of the interstate and international systems,
     (b) the relevant policies of the forum,
     (c) the relevant policies of other interested states and the
     relative interests of those states in the determination of
     the particular issue,
     (d) the protection of justified expectations,
     (e) the basic policies underlying the particular field of
     law,
     (f) certainty, predictability, and uniformity of result, and
     (g) ease in the determination and application of the law to
     be applied.

Restatement (Second) of Conflict of Laws § 6(2) (1971).  In
circumstances such as those presented here, where the parties to
a contract have failed to make an effective choice of law
themselves, the Restatement states that the "contacts to be taken

-9-

into account in applying the principles of § 6 to determine the
law applicable to an issue include:

>     (a) the place of contracting,
>     (b) the place of negotiation of the contract,
>     (c) the place of performance,
>     (d) the location of the subject matter of the contract, and
>     (e) the domicil, residence, nationality, place of
>     incorporation and place of business of the parties."

Id. at § 188(2).  With respect to order of importance, the
Restatement directs that "[t]hese contacts are to be evaluated
according to their relative importance with respect to the
particular issue."  Id.

In determining that Virginia law regarding attorney's liens
applied pursuant to what it termed the "significant contacts"
test called for under Massachusetts choice of law analysis, the
Bankruptcy Court concluded:

>     [a]lthough the only contact with Virginia may be that the
>     Patent and Trademark Office is located there, the filing of
>     the patent applications and obtaining of some patents are
>     fundamental to Ropes' assertion of its lien.  But for the
>     patent applications, all of the fees are unsecured.
>     Therefore, while there are more contacts with Massachusetts,
>     the Court finds that the most significant and meaningful one
>     is with Virginia.

Engage, 315 B.R. at 213.[2]  By referring to the applicable test as

---

[2]Before turning to Massachusetts choice of law analysis as
an alternative, the Bankruptcy Court made its primary conclusion
"[t]hat the law of the jurisdiction where judgment entered [i.e.,
Virginia] should control seems obvious: but for the judgment
there is no right to enforce a charging lien."  Engage, 315 B.R.
at 212.  The court reached this conclusion based on "[a] litany
of authority suggest[ing] that the determination of what state
law should apply to a given proceeding is a qualitative analysis
determined by the 'law of the state in which the legal services
are to be performed.'"  Id. at 211-12.  With respect to the
question of where "the legal services are to be performed" when a
law firm in state A represents its client in proceedings in state

"significant contacts," rather than as "significant
relationship," the Bankruptcy Court appears to have focused too
narrowly on where the most significant contact was found rather
than on the state with the most significant relationship to the
transaction.

A broader consideration of the relevant § 188(2) contacts
leads to the conclusion that Massachusetts is the state with "the
most significant relationship to the transaction and the parties
under the principles stated in § 6"[3] and its laws will determine
"[t]he rights and duties of the parties with respect to an issue
in contract." Id. at § 188(1). Without mentioning the § 6

---

B, the court cited with approval a secondary source stating that:

> '[t]he generally accepted rule is that the existence and
> effect of an attorney's lien arising under such a contact is
> governed by the law of the place where the contract is to be
> performed, that is, where the contemplated action or
> proceeding is to be instituted, and not by the place where
> the contract was made...'

Id. at 212 (quoting E.H. Schopler, Annotation, Conflict of Laws
as to Attorneys' Liens, 59 A.L.R. 2d 564, 1958 WL 11124 (1958)
(footnotes omitted)). At the conclusion of this line of
analysis, the court noted that "[a]pplying Massachusetts choice
of law for contract actions leads to the same conclusion,"
Engage, 315 B.R. at 212, and proceeded to re-address the question
employing Massachusetts choice of law principles.

[3]As set forth, supra, those principles are: "(a) the needs
of the interstate and international systems, (b) the relevant
policies of the forum, (c) the relevant policies of other
interested states and the relative interests of those states in
the determination of the particular issue, (d) the protection of
justified expectations, (e) the basic policies underlying the
particular field of law, (f) certainty, predictability, and
uniformity of result, and (g) ease in the determination and
application of the law to be applied." Restatement (Second) of
Conflict of Laws § 6(2) (1971).

principles or discussing how they applied, the Bankruptcy Court
concluded that the "most significant and meaningful" <u>contact</u> was
with Virginia because the patent applications and patents
"fundamental to Ropes' assertion of its lien" were filed and
obtained at the federal Patent and Trademark Office in Virginia.
315 B.R. at 213.  I find this conclusion to be clearly erroneous.

In defense of the Bankruptcy Court's choice of Virginia law,
the Liquidating Supervisor contends that "[n]o reasoned
distinction can be drawn between the application of Virginia's
lien law to proceedings before the USPTO, on the one hand, and
the application of any state's attorney's lien law to a federal
cause of action in a federal court sitting in that state."  Brief
of Appellee at 16.  I disagree.  The fundamental distinction to
be drawn is that the USPTO is a nationwide federal administrative
<u>agency</u>, not a court sitting within a particular state.
Proceedings in the USPTO are  governed by its own laws, rules,
Code of Professional Responsibility, and admissions standards,
which allow for attorneys and non-attorneys alike to register to
practice before the Office.  Unlike the customary approach of the
local rules of United States District Courts, they do not
incorporate particular state rules by reference.

The needs of the interstate system, the initial § 6(2)
principle, would be compromised, rather than advanced, by finding
that Virginia attorney's lien law governs all proceedings in the
USPTO.  Such a holding potentially would give nationwide effect,
at least within this federal field of practice, to the policy

determination of a single state regarding the tools available for
attorneys to collect fees for work performed.  To the extent that
other states whose attorneys practice in the field of patent law
-- and, consequently, appear before the USPTO -- have attorney's
lien statutes allowing for such liens to attach in patent
prosecution work, a finding that Virginia attorney's lien law
applies to all USPTO proceedings would defeat the related
principle of advancing "relevant policies of other interested
states."  § 6(2)(c).  Although this result might tend to enhance
"certainty, predictability, and uniformity of result," another of
the § 6(2) principles, it would only do so if all states accepted
the extrajurisdictional reach of Virginia attorney's lien law
with respect to USPTO proceedings.  See Bushkin, 393 Mass. at 635
(finding § 6(2) uniformity principle not advanced where other
jurisdictions had not accepted analogous "extrajurisdictional
reach").  Courts in two states, Minnesota and New York, have held
that their own attorney's lien law applies to representation of
clients in patent proceedings before the USPTO.  Schroeder,
Siegfried, Ryan & Vidas v. Modern Elec. Products, Inc., 295
N.W.2d 514, 516 (Minn. 1980); Hedman, Gibson & Costigan, P.C. v.
Tri-Tech Sys. Int'l Inc., No. 92 Civ. 2757, 1994 WL 18536, at *1,
*4 (S.D.N.Y. Jan. 14, 1994), modified by 1995 WL 555702 (S.D.N.Y.
Sept. 18, 1995).

In addition to consideration of the "relevant policies," §
6(2)(c) suggests a balancing test to identify "the relative

-13-

interests of [other interested] states in the determination of the particular issue."  Neither the Bankruptcy Court nor the appellee explain why Virginia would have an interest in this "particular issue" in the first place, much less why its interest should be found paramount.  No Virginia parties or counsel appeared in the federal administrative proceedings at issue, no Virginia law was applied, and none of the Virginia's mechanisms for regulating the legal profession were employed.  In a head-to-head comparison with Massachusetts, whose attorneys appeared in the action, it is difficult to see how Virginia law should prevail.

Section 6(2)(b), the "relevant policies of the forum" principle, also weighs in favor of applying Massachusetts law in this instance.[4]  As discussed by the Bankruptcy Court and conceded by R&G, if Virginia attorney's lien law applies to all proceedings in the USPTO, it would not be possible for R&G -- or for an attorney from any other state, for that matter -- to effect a lien based on representing a client in that forum.[5]  The

---

[4]I am assuming, for purposes of this analysis, that the USPTO is the forum.

[5]The Virginia attorney's lien statute, set forth below in relevant part, only allows for such liens when the attorney represents a client in a tort action, an action to recover liquidated or unliquidated damages in contract, or a divorce action, therefore excluding patent prosecution actions before the USPTO.

Any person having or claiming a right of action sounding in

-14-

Consolidated Patent Rules applicable to patent prosecution
proceedings in the USPTO indicate that the forum contemplated a
different result.  Rule 10.64, titled "Avoiding acquisition of
interest in litigation or proceeding before the Office," provides
that:

> (a) A practitioner shall not acquire a proprietary interest
> in the subject matter of a proceeding before the Office
> which the practitioner is conducting for a client, except
> that the practitioner may:
> > (1) Acquire a lien granted by law to secure the
> > practitioner's fee or expenses; or
> > (2) Contract with a client for a reasonable contingent
> > fee; or
> > (3) In a patent case, take an interest in the patent as
> > part of all of his or her fee.

37 C.F.R. § 10.64 (2005).  By carving out an exception for
attorney's liens from the general prohibition against
practitioners "acquiring a proprietary interest" in patent claims

---

> tort, or for liquidated or unliquidated damages on contract
> or for a cause of action for annulment or divorce, may
> contract with any attorney to prosecute the same, and the
> attorney shall have a lien upon the cause of action as
> security for his fees for any services rendered in relation
> to the cause or action or claim.  When any such contract is
> made, and written notice of the claim of such lien is given
> to the opposite party, his attorney or agent, any settlement
> or adjustment of the cause of action shall affect the
> existing law in respect to champertous contracts.  In causes
> of action for annulment or divorce, an attorney may not
> exercise his claim until the divorce judgment is final and
> all residual disputes regarding marital property are
> concluded.  Nothing in this section shall affect the
> existing law in respect to exemptions from creditor process
> under federal or state law.

Va. Code Ann. § 54.1-3932 (2004).

they prosecute for clients in the USPTO, the USPTO itself clearly indicated a policy choice permitting attorney's liens "granted by law." A determination that Virginia law regarding such liens governs all proceedings before the USPTO would render this choice a nullity.

The final § 6(2) principle necessary to address specifically, the "protection of justified expectations," is one the SJC has highlighted as a "significant consideration" in the choice of law analysis. Bushkin, 393 Mass. at 635. In support of its argument that the Bankruptcy Court's choice of law conclusion should be upheld, the Liquidating Supervisor points to a well-developed body of case law holding that the attorney's lien law of the state in which a lawsuit was brought -- and for cases commenced in federal court under diversity jurisdiction, the law of the state in which the federal court sits -- applies. See, e.g. American Metrocomm, 274 B.R. at 660-62; Great Lakes Transit Corp. v. Marceau, 154 F.2d 623, 626 (2d Cir. 1946); Peresipka v. Elgin, Joliet & Eastern Ry. Co., 231 F.2d 268, 271-72 (7th Cir. 1956); Lehigh & N.E. R. Co. v. Finnerty, 61 F.2d 289, 290 (3d Cir. 1932); Hoxsey v. Hoffpauir, 180 F.2d 84, 86 (5th Cir. 1950).

But the reasoning underlying these decisions implicates different considerations of intent and expectation. The bankruptcy court in American Metrocomm, for example, responded to and rejected the argument by the claimant law firm that the

-16-

attorney's lien law of Illinois applied.  Although the client
representation contract was negotiated and executed at the law
firm's office in Illinois and the client's case files were there,
the bankruptcy court found that the attorney's lien law of
California and/or Louisiana, "the places where performance of the
contract was intended, anticipated, and actually took place,"
applied:

> [] Duane Morris cannot argue that it had a justified
> expectation that only Illinois law would control.  As
> members of the legal profession, Duane Morris attorneys
> know, or should know, that they become subject to the
> professional rules of conduct in each state in which they
> appear on behalf of a client.  Two Illinois attorneys
> appeared on behalf of AMC in California, were admitted pro
> hac vice for that purpose, and therefore, agreed to abide by
> California's Rules of Professional Conduct.  One of the
> attorneys representing AMC is a member of the California
> Bar.  Cisco's action against AMC was transferred to
> Louisiana upon motion submitted by these attorneys.  At the
> same time, AMC's action against Cisco was pending in
> Louisiana. Therefore, Duane Morris should have reasonably
> expected that Louisiana and California might govern the
> determination of whether it has a valid lien on the Attorney
> Files.

Id. at 662.  See also Lehigh, 61 F.2d at 290 (holding that "the
employment of an attorney of New Jersey and the bringing of suit
in New Jersey indicate that the parties intended from the first
that suit should be brought in that state.  And being brought
there, the laws of that state control as to the lien."); Hoxsey,
180 F.2d at 86 (finding that "by his employment of counsel and
the institution of suit in the Court in New York the appellant
[client] became subject to the statutes of New York regulating

-17-

and controlling the attorney-client relationship with reference
to the fixing and enforcing of the respective rights between the
parties" and "Federal Courts sitting in a State enforce that
State's statutes creating attorney's liens").

By contrast, the USPTO has its own standards of admission
and Code of Professional Responsibility.  Proceedings before the
USPTO are governed by the agency's own rules and regulations.
Attorneys appearing before the USPTO, therefore, would have a
"justified expectation" of being subject to the USPTO rules of
professional conduct.  Absent some other basis -- for example,
being admitted to practice in Virginia, representing a client
from Virginia, specifically agreeing with a client that Virginia
law governed the representation -- an attorney representing a
client before the USPTO would have no rational basis for
supposing that Virginia attorney's lien law governed the
representation.

Furthermore -- and in contrast to an attorney representing a
client in state or federal court proceedings in Virginia -- an
attorney appearing in the USPTO would have received no prior
notice that Virginia law might apply.  While the caselaw is rife
with decisions, as the Liquidating Supervisor points out,
explaining the applicability of the attorney's lien law of the
state in which a suit was brought to those proceedings, it
contains not a single ruling -- other than the one that is the
subject of this appeal -- holding that proceedings in the USPTO

-18-

are governed by Virginia attorney's lien law, or any other aspect
of Virginia law for that matter.

Accordingly, pursuant to the "most significant relationship"
choice of law analysis applicable under both Massachusetts law
and federal common law, I find that the USPTO proceedings at
issue were governed by the attorney's lien law of Massachusetts,
not Virginia.

## C. Applicability of Massachusetts Lien Statute to Patent Prosecution

To determine whether R&G has a valid lien against the
proceeds of the patents and patent applications, it is necessary
first to resolve whether the Massachusetts attorney's lien
statute, Mass. Gen. Laws ch. 221, § 50, allows for a lien in
patent prosecution work at all.  The statute reads:

> From the authorized commencement of an action, counterclaim
> or other proceeding in any court, or appearance in any
> proceeding before any state or federal department, board or
> commission, the attorney who appears for a client in such
> proceeding shall have a lien for his reasonable fees and
> expenses upon his client's cause of action, counterclaim or
> claim, upon the <u>judgment</u>, <u>decree</u> or <u>other order</u> in his
> client's favor entered or made in such proceeding, and upon
> the proceeds derived therefrom. Upon request of the client
> or of the attorney, the court in which the proceeding is
> pending or, if the proceeding is not pending in a court, the
> superior court, may determine and enforce the lien;
> provided, that the provisions of this sentence shall not
> apply to any case where the method of the determination of
> attorneys' fees is otherwise expressly provided by statute.

<u>Id.</u>

Prior to the enactment of the current attorney's lien
statute in 1945, Massachusetts law provided for an attorney's
lien only in limited circumstances:

-19-

> An attorney who is lawfully possessed of an execution, or who has prosecuted a suit to final judgment in favor of his client, shall have a lien thereon for the amount of his fees and disbursements in the cause, but this section shall not prevent the payment of the execution or judgment to the judgment creditor by a person who has no notice of the lien.

R.L. 1902 ch. 165, § 48 (text available in statutory history annotation to Mass. Gen. Laws ch. 221, § 50 (West 1993)).

The current attorney's lien law is much broader in scope than its predecessor, allowing for such liens not only when attorneys represented their clients in court actions but also when they appeared for clients "in any proceeding before any state or federal department, board or commission."  Mass. Gen. Laws ch. 221, § 50.  The new law also expanded the range of terminal events upon which a lien could attach from only an execution or "final judgment" in favor of the client, to include a "judgment, decree or other order in his client's favor."  Id. Thus, for example, if an attorney represented his client in proceedings before the Massachusetts State Board of Retirement and obtained a favorable decision awarding his client a lump sum payment, the attorney would have an attachment on that award pursuant to the attorney's lien statute for his reasonable fees and expenses related to representing his client in those proceedings.

The Bankruptcy Court agreed that the Massachusetts attorney's lien statute applies to administrative agency proceedings, citing both the "before any state or federal

department, board or commission" language in the statute, as well
as an unpublished Appeals Court of Massachusetts decision finding
that an attorney asserting a lien could satisfy the first of four
requisite elements for an attorney's lien by appearing and
rendering representation in an administrative agency.  Engage,
315 B.R. at 213-14 (citing Gormley v. Wilkins, No. 00-P-1490,
2002 WL 31204473 at ***2 (Mass. App. Ct. Oct. 3, 2002)).

The Bankruptcy Court went on to list the "three additional
requirements [that] must also be met" for an attorney to be
entitled to such a lien: (1) the attorney's fees must be
reasonable; (2) a judgment, decree or order must have entered in
connection with the attorney's representation of the client; and
(3) the judgment, decree or order must be in the client's favor.
Engage, 315 B.R. at 214 (citing Gormley, 2002 WL 31204473 at
***2).  It was on the second of these grounds that R&G's argument
faltered, the Bankruptcy Court concluded.  The court found that:

> the Massachusetts attorney's charging lien statute and the
> courts interpreting it have clearly stated that an
> attorney's lien can only exist and become choate when all of
> the elements are met.  Ropes' inchoate lien would thus only
> mature and become choate if the patents, patent applications
> and the proceeds deriving therefrom rightly constitute a
> "judgment, decree or other order" pursuant to M.G.L. c. 221
> § 50.  They do not.

Id. at 215.

In explaining why it remained unconvinced that patent
prosecution work "falls within the purview of the unambiguous
terms of the statute," id. at 214, the Bankruptcy Court stated
that:

-21-

A patent does not order anyone to do anything or pay any
money.  Even if a patent could be deemed an order, however,
the proceeds derived from its sale do not stem from the
actual order of the Patent Office, but rather from the sale
of the underlying intellectual property protected by the
patent.  Since allowance of the applications did not itself
require or trigger the payment of any money and no judgment,
decree or other order entered in connection with Ropes'
representation, it thus follows that no charging lien
attached.

Id.

The Court concluded that "if Massachusetts law applies to this

dispute,. . . Ropes has nothing more than an inchoate lien in the

proceeds of its patents, applications and patent prosecution

actions."  Id. at 217.

Following de novo review of this issue, I conclude that R&G

does not have even an inchoate lien on the "proceeds of [the]

patents, applications and patent prosecution actions" pursuant to

Mass. Gen. Laws ch. 221, § 50, because patent prosecution actions

in the USPTO, by definition, cannot yield the sort of "judgment,

decree or order" required for such a lien to be perfected.

The Massachusetts Supreme Judicial Court has clearly

explained what sort of lien the Massachusetts statute allows.

"[T]he type of lien created by G.L. c. 221, s 50, is a charging

lien which binds the judgment or money decree for payment of

expenses incurred and for services rendered by an attorney with

respect to the particular action or suit."  Torphy v. Reder, 357

Mass. 153, 156 (1970).  In Torphy, an attorney petitioned to

establish and enforce an attorney's lien under Mass. Gen. Laws

ch. 221, § 50, against certain of his client's stock certificates

-22-

and bankbooks, which had been placed in escrow in a safety
deposit box in the course of the underlying lawsuit and were
removable only with the signature of counsel for both parties in
that action.  Id. at 153-55.  The court in the underlying action
determined that one-half of the property at issue, including the
stock certificates and bankbooks placed in escrow, belonged to
the client's wife, who had commenced the lawsuit.

Responding to his former attorney's petition for a lien on
the escrowed property, the client argued that "since there was no
decree in his favor there was nothing to which the statutory lien
could attach."  Id. at 155-56.  The SJC agreed, and determined
that the petitioning attorney "sought to assert, if anything, a
possessory or retaining lien," as distinguished from the charging
lien provided for by the statute.  Id. at 156.  The Court
declined to resolve the open question of "[w]hether in this
Commonwealth an attorney has a lien for his fees on the moneys,
papers, books or other property of his client which come in to
his possession," finding that no necessary lien could be claimed
where, as in this case, the attorney held his client's property
in conjunction with another and pursuant to a voluntarily assumed
fiduciary duty as escrow agent.  Id.

In the teeth of this determination by the SJC that the
charging lien available under Mass. Gen. Laws ch. 221, § 50,
depends upon a "judgment or money decree" being entered in favor
of the client in the "particular action or suit" for which the

-23-

attorney seeks compensation, R&G argues that the statute imposes
no requirement for a "judgment, decree or other order" in order
for such a lien to attach.  To support this contention, the sole
Massachusetts decision R&G relies on is <u>Webber v. Napolitano</u>, 320
Mass. 765 (1947), an SJC rescript opinion R&G contends "directly
supports the conclusion that the attorney's lien applies to
patent prosecution work."  I disagree.

In <u>Webber</u>, an attorney brought suit in equity to recover
$250 from his former client allegedly due as fees for legal
services provided in obtaining a lodging house license for the
client from the City of Boston Licensing Board.  <u>Id.</u> at 766.  The
defendant-client filed a counterclaim alleging that the attorney
"unreasonably, maliciously and without right retained possession
of the lodging house keeper's license" issued in the name of the
client for twenty days, despite the client's repeated demands
that he release it, and thereby deprived the client of "earning
any income from said lodging house" during that time period.  <u>Id.</u>
at 765.  In response to the counterclaim, the attorney admitted
that he had retained the license issued in his client's name but
that he "did so legally as he had an attorney's lien on the said
license as provided by [the Massachusetts attorney's lien
statute]."  <u>Id.</u>

The trial court entered judgment for the attorney on his
claim, ordered the client to pay the attorney $250 -- which it
found was "fair and reasonable compensation" for the services

-24-

rendered -- plus interest thereon, and dismissed the client's
counterclaim.  Id.  The report of material facts by the trial
court supporting its decision included the following findings:

> 'the plaintiff received from the licensing board a lodging
> house license which he obtained from the licensing
> commission for the benefit of his client the defendant, but
> I do not find that he retained said license unreasonably,
> maliciously and without right.'

Id.  The defendant appealed the decision, contending that his
counterclaim based on the attorney's retention of the license for
twenty days was dismissed in error.

    In affirming the decision of the trial court, the SJC held
that:

> The decree is supported by the findings of material facts.
> These facts are not mutually inconsistent, nor are they
> plainly wrong or incompatible with the pleadings.  They are
> not incompatible with the admission by the plaintiff of 'the
> alleged demands' by the defendant for the license or with
> the plaintiff's admission that he re[]tained possession of
> the license and refused to turn it over to the defendant.
> The admitted facts, which did not include the terms of the
> employment of the plaintiff by the defendant or the period
> of retention of the license by the plaintiff, did not
> require a finding that the plaintiff retained the license
> 'unreasonably, maliciously and without right.'  This is true
> whether or not the plaintiff had any right under [the
> Massachusetts attorney's lien statute].

Id. at 765-66 (internal citation omitted).  Based on this text,
R&G argues that "[i]n Webber, the Supreme Judicial Court
recognized that an attorney is entitled to a lien on economically
valuable assets that are created by virtue of that attorney's
services.  Indeed, the Court acknowledged the existence of the
lien both under the Massachusetts Attorney's Lien Statute and as

a matter of general equitable principles."  Brief of Appellants at 16-17.  That is, at best, a hopeful reading of the decision.

The ruling in <u>Webber</u> makes only glancing reference to the Massachusetts attorney's lien statute and then only to observe the statute was immaterial to the outcome.[6]  This reference simply cannot support R&G's contention that the attorney's lien provided for by Mass. Gen. Laws ch. 221, § 50, extends to any "economically valuable assets [] created by virtue of that attorney's services."  <u>Webber</u> cannot be read as a specific, affirmative finding by the court that the attorney had a lien on the license pursuant to the attorney's lien law.  In concluding that a different result was not compelled by law, the SJC noted -- for purposes of completeness, presumably -- that the attorney's defense to the counterclaim did not depend on the rights he had, if any, to a lien on the license under that law.

Even if its interpretation of <u>Webber</u> as extending the Massachusetts attorney's lien law to "economically valuable assets that are created by virtue of that attorney's services" were accepted, R&G would bear a further burden.  The patents and patent applications on which it asserts liens have since been sold.  For R&G to prevail, therefore, requires another interpretive leap, a finding that the phrase "the proceeds derived therefrom" in the Massachusetts attorney's lien statute

---

[6]The Court reached its decision "whether or not the plaintiff had any right under [the Massachusetts attorney's lien statute]."  <u>Webber</u>, 320 Mass. at 766.

has dual antecedents and thereby modifies both "judgment, decree and other order in his client's favor" (the phrase immediately preceding it) and also "[the] client's cause of action, counterclaim, or claim."  Such an interpretative undertaking is supported neither by precedent nor by logic.

The Bankruptcy Court rejected both this proposed interpretation and also the invitation by R&G to repudiate what it characterizes as "passing dictum" in a prior Bankruptcy Court decision finding that the phrase "the proceeds derived therefrom" in Mass. Gen. Law ch. 221, § 50, "modifies the prior phrase, 'upon the judgment, decree or other order . . .' only."  In re Leading Edge Products, Inc., 121 B.R. 128, 131 (Bankr. D. Mass. 1990), aff'd Civ. A. No. 90-13112-Z, 1991 WL 97459, at *1 (D. Mass. May 28, 1991).  In Leading Edge, a law firm asserted that it possessed an attorney's lien under Mass. Gen. Laws ch. 221, § 50, on the post-petition settlement of a breach of contract action it had commenced on behalf of the debtors pre-petition.  The settlement entailed the mutual release of claims between the parties, "[t]here was no cash exchanged in the context of the settlement, and the litigation was voluntarily dismissed without judgment entering in favor of either party."  Leading Edge, 121 B.R. at 129.  As R&G does in the present action, the claimant attorneys in Leading Edge argued that the words "the proceeds derived therefrom" in the attorney's lien statute modified "cause of action, counterclaim or claim," not just "judgment, decree or other order."  Id. at 130.  The court did not accept this

-27-

reading, reasoning that:

> It seems likely to the Court that the drafters of section 50
> contemplated the existence of a fund, either made up of cash
> or capable of being reduced to cash, generated from a
> judgment, decree or other order, including an order
> approving a settlement.  The benefit derived from the
> elimination of [the opposing party's claim against the
> Debtor in the breach of contract case] did not bring
> anything into the estate per se--it merely reduced the
> amount of money that had to be paid out of the Debtors'
> estate. The Court finds that this is not equivalent to
> "proceeds."

Id. at 131.  In affirming the Bankruptcy Court's decision in

Leading Edge, the district court held that:

> [] Leading Edge received no cash or cash equivalent as the
> result of the settlement. Rather, the benefit derived from
> the elimination of [the opposing party's] claim was merely
> the elimination of Leading Edge's debt to this creditor . .
> .. No case in Massachusetts recognizes such a benefit as
> attachable proceeds under the charging lien statute; all of
> the relevant cases apply the statute only to a cash fund.
> Indeed, the use in § 50 of the word "proceeds" (as opposed
> to a broader term, such as "benefits") indicates that the
> section's drafters contemplated such a fund.

Leading Edge, 1991 WL 97459, at *1.[7]

The reasoning employed by both courts in Leading Edge

regarding the use of the word "proceeds" in the Massachusetts

attorney's lien statute is fully consistent with the later

---

[7]The open question identified in the decision of the
district court regarding whether an attorney's lien may attach
pursuant to Mass. Gen. Laws ch. 221, § 50, to a pre-judgment
settlement has since been answered, at least with respect to
settlements that entail the filing of a stipulation of dismissal
with prejudice pursuant to Mass. R. Civ. Pro. Rule 58.  See,
e.g., Craft v. Kane, 51 Mass. App. Ct. 648, 653 (Mass. App. Ct.
2001) (holding that "[b]ecause G.L. c. 221, § 50 expressly refers
to judgments 'entered or made,' the stipulation of dismissal
constituted a judgment within the meaning of the attorney's lien
statute"); Phalon v. Technical Communications Corp., No. 9802553,
1999 WL 1326754, at *1, *3 (Mass. Super. Feb. 26, 1999).

decision by the Massachusetts Appeals Court in <u>Cohen v. Lindsey</u>, 38 Mass. App. Ct. 1, 4 (1995), where the attorney client prevailed. In <u>Cohen</u>, an attorney representing a landlord in an eviction action obtained a court-ordered injunction requiring the defendant-tenant to pay funds into an escrow account pending final resolution of the action. The attorney asserted a lien against the funds under Mass. Gen. Laws ch. 221, § 50. A creditor of the attorney's client challenged the asserted lien and the Superior Court denied the attorney the relief sought.

The Appeals Court reversed the lower court, finding that the attorney did have a lien on the court-ordered escrow account.

> [T]he judge ordered [the tenant] to pay $10,000 per month into the fund for the use and occupancy of the [subject property], subject to a final determination of each party's rights and liabilities. The order established the fund as potential security for [the landlord], pending an entry of final judgment in the case. The effect of the order was the same as an equitable attachment to reach and apply credits of [the tenant] to satisfy [the landlord's] claim. That the order actually required a transfer of funds in favor of [the attorney's] client differentiates the order from a simple attachment, which might not be the occasion of giving ground for an attorney's lien. . . . When, as occurred in this case, [the attorney's] efforts resulted in a fund available to satisfy [the client's] liability to the [challenging creditor], we may conclude from the language of the first sentence of G.L. c. 221, § 50, that the use of the fund for the payment of legal fees was appropriate.

<u>Id.</u> at 4-5 (internal citations omitted).

I concur in interpretation of the phrase "the proceeds derived therefrom" in Mass. Gen. Laws ch. 221, § 50, to modify only "the judgment, decree or other order in his client's favor." Indeed, finding otherwise would impermissibly expand the scope the attorney's lien statute beyond its plain terms. To be sure,

-29-

the drafters of the Massachusetts attorney's lien statute could
have provided for an attorney's lien that attached not only to
proceeds deriving from a "judgment, decree or other order in
[the] client's favor" but also to the client's property.  But the
drafters chose not to do so.

One of the two cases relied upon by R&G that address whether
an attorney's lien can attach to a patent, Schroder, 295 N.W.2d
514, involves just such an expansive statute.  The Minnesota
attorney's lien law at issue there provided that:

> An attorney has a lien for compensation whether the
> agreement for compensation is expressed or implied (1) upon
> the cause of action from the time of the service of the
> summons in the action, or the commencement of the
> proceeding, and (2) upon the interest of the attorney's
> client in any money or property involved in or affected by
> any action or proceeding in which the attorney may have been
> employed, from the commencement of the action or proceeding,
> and, as against third parties, from the time of filing the
> notice of the lien claim, as provided in this section.

Minn. Stat. Ann. § 481.13(a) (2005).   The decision by the
Schroder court that the plaintiff law firm did have an attorney's
charging lien on a patent "obtained in part because of [the law
firm's] work on the application for the patent," Schroder, 295
N.W.2d at 515, is thus readily distinguishable.

As the Bankruptcy Court in this action noted, "[t]he
language encompassed in the Minnesota statute is significantly
broader than that contained in the Massachusetts statute."
Engage, 315 B.R. at 215.  Under Minnesota law, the reach of an
attorney's lien extends to "the interest of the attorney's client
in any money or property involved in or affected by any action or

-30-

proceeding in which the attorney may have been employed."  Minn. Stat. Ann. § 481.13 (2005) (emphasis supplied).  If that law were applicable to this action, it would vest R&G with an attorney's lien on the proceeds of the sale of Debtor's patents and patent applications, as those funds constitute "money . . . affected by [an] action or proceeding" in which R&G was employed, i.e., the patent prosecution proceedings before the USPTO.  Under the more restrictive Massachusetts attorney's lien statute, however, a different result must obtain.

As a final matter, I note the effort by R&G to conflate the word "claim" in the text of the Massachusetts attorney's lien statute with the patent "claims" granted to the Debtor by the USPTO.  As the Liquidating Supervisor points out and the Bankruptcy Court suggested, the proceeds that R&G seeks to attach stem from the underlying intellectual property of the Debtor, not from the "claim" it made before the USPTO for a patent protecting that property.  "Claim" is a term of art in patent law, constituting a "formal statement describing the novel features of an invention and defining the scope of the patent's protection." Black's Law Dictionary 241 (7th ed. 1999).[8]  Absent some

---

[8]It is this term of art definition that distinguishes Hedman, Gibson & Costigan, P.C. v. Tri-Tech Sys. Int'l Inc., 1994 WL 18536 (S.D.N.Y. 1994), the other case R&G relies upon for the proposition that a patent prosecution can give rise to an attorney's lien.  The New York statute at issue in Hedman recognizes attorney's liens in a broad range of events capaciously stated:  "verdict, report, determination, decision, judgment."  N.Y. Judiciary Law § 475 (McKinney 1983).  This language can be read to encompass the determination or decision to grant a patent for a claim.

principled basis or justification for substituting this specialized meaning of "claim" in patent law for the general ones applicable to the litigation context,[9] I am not free to subject the attorney's lien statute to such a tortured interpretation. Cf. United Housing Foundation v. Forman, 421 U.S. 837, 848-851 (1975) (holding that housing transaction evidenced by shares called "stock" did not by that choice of nomenclature fall within securities law definition of "stock").

I conclude, therefore, that no attorney's lien under Mass. Gen. Laws ch. 221, § 50, attached in favor of R&G to the patents, patent applications, or proceeds from the sale of the same, based on R&G's representation of the Debtor in patent prosecution proceedings before the USPTO.

### III.  CONCLUSION

For the reasons set forth more fully above, I affirm the determination of the Bankruptcy Court that the claim by R&G for attorney's fees owed by the debtor is unsecured.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[9]For example, "the assertion of an existing right;" "a demand for money or property to which one asserts a right;" "an interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing," id. at 240.

-32-